**UNCLASSIFIED//FOR PUBLIC RELEASE**

**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 15-5267**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MUSTAFA AHMED ADAM AL-HAWSAWI,

Appellant,

v.

BARACK H. OBAMA, ET AL.,

Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**PUBLIC APPENDIX**
**Classified Material in Separate Supplement**

———————————

<div style="display:flex">

WALTER B. RUIZ, JR.
  *(703) 696-0028*
  *walter.ruiz@osd.mil*

SUZANNE M. LACHELIER
  *(703) 588-0445*
  *suzanne.lachelier@osd.mil*

  *Office of Military Commissions*
  *Office of the Chief Defense Counsel*
  *1515 Wilson Boulevard, 4th Floor*
  *Arlington, VA 22209*

*Counsel for Appellant*

DOUGLAS N. LETTER
MATTHEW M. COLLETTE
SONIA K. McNEIL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7234*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-8209*
  *sonia.k.mcneil@usdoj.gov*

*Counsel for Appellees*

</div>

---

**UNCLASSIFIED//FOR PUBLIC RELEASE**

**UNCLASSIFIED//FOR PUBLIC RELEASE**

## TABLE OF CONTENTS

| Docket Entry | Document | Pages |
|---|---|---|
| 13 | Memorandum Order Denying Petitioner's Motion for Preliminary Injunction and Dismissing the Petition Without Prejudice (Sept. 10, 2015) (Exhibit A) | JA 1-4 |
| 15-1 (pp. 20-24) | Declaration of Jennifer Williams (July 31, 2015) (Exhibit B) | JA 5-10 |
| 15-2 (pp. 36-38) | Memorandum for the Treating Physician of Mustafa al Hawsawi (Mar. 19, 2014) (Exhibit C) | JA 11-14 |
| 15-3 (pp. 1-4) | Memorandum for Treating Physician Mustafa al Hawsawi (July 10, 2014) (Exhibit D) | JA 15-19 |
| 15-1 (pp. 75-78) | Joint Task Force-Guantanamo Denial of Meeting Request with Al-Hawsawi's Medical Providers (Aug. 18, 2014) (Exhibit E) | JA 20-23 |
| 15-1 (pp. 26-38) | Defense Emergency Motion for Appropriate Medical Intervention and Return of Legal Files (AE 332), *United States v. Mohammad* (Military Comm'ns Trial Judiciary Dec. 15, 2014) (Exhibit F) | JA 24-36 |
| 15-1 (pp. 80-88); continued on 15-2 (pp. 1-3) | Defense Motion To Depose Mr. al Hawsawi's Health Care Providers (AE 340), *United States v. Mohammad* (Military Comm'ns Trial Judiciary Jan. 23, 2015) (Exhibit G) | JA 37-49 |
| 15-1 (pp. 15-16) | Order, Defense Motion for Medical Intervention (AE 332C), *United States v. Mohammad* (Military Comm'ns Trial Judiciary Mar. 10, 2015) (Exhibit H) | JA 50-52 |
| 15-1 (pp. 17-18) | Order, Defense Motion to Depose Mr. Al Hawsawi's Health Care Providers (AE 340B), *United States v. Mohammad* (Military Comm'ns Trial Judiciary Mar. 10, 2015) (Exhibit I) | JA 53-54 |
| 10-1 | Charge Sheet, *United States v. Mohammad* (Military Comm'ns Trial Judiciary Apr. 4, 2012) (Exhibit J) | JA 55-89 |

**UNCLASSIFIED//FOR PUBLIC RELEASE**

# Exhibit A

UNCLASSIFIED//FOR PUBLIC RELEASE

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MUSTAFA AHMED ADAM AL-HAWSAWI, | ) )<br>) |
| Petitioner, | ) )<br>) |
| v. | )  Civil Action No. 15-1257 (RJL) |
| BARACK HUSSEIN OBAMA, et al., | ) )<br>) |
| Respondents. | ) |

**FILED**

**SEP 10 2015**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### MEMORANDUM ORDER

September **10**, 2015 [Dkts. # 1, #2]

Petitioner, Mustafa Ahmed Adam Al-Hawsawi ("Petitioner"), is a Saudi national

currently detained at the United States Naval Station at Guantanamo Bay, Cuba, facing

charges before a military commission, including capital offenses related to his alleged

role in the September 11, 2001 terrorist attacks. On August 5, 2015, Petitioner filed with

this Court a Petition for Writ of Habeas Corpus. *See* Pet. for Writ of Habeas Corpus

[Dkt. # 1] ("Petition"). On the same day, Petitioner filed a Motion for Preliminary

Injunction. *See* Mot. for Prelim. Inj. [Dkt. # 2] ("Motion").

The Petition does not challenge the legality of Al-Hawsawi's detention, but

instead, in effect, asserts discovery requests in which Petitioner seeks to obtain an

independent medical examination, unredacted copies of his medical records, and other

materials relating to his treatment and medical care during the course of his detention. In

1

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #15-5267   Document #1580926   Filed 10/2015   Page 5 of 91
Case 1:15-cv-01257-RJL   Document 13   Filed 09/10/15   Page 2 of 3

his Motion, Petitioner requests that this Court enjoin further proceedings in his military
prosecution pending resolution of his purported Petition for Writ of Habeas Corpus.

Unfortunately for the Petitioner, the Court finds that it lacks subject-matter
jurisdiction, the Petition must be dismissed, and the Court will not reach the merits of
Petitioner's Motion for Preliminary Injunction.

Petitioners' claims fall outside the scope of habeas, and, therefore, are
jurisdictionally barred. Section 2241(e)(2) of the Military Commissions Act of 2006
divests courts of jurisdiction over any actions that are not "proper claim[s] for habeas
relief." *Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009). Habeas encompasses
challenges to the fact or duration of detention, which "lie at the heart of habeas corpus,"
*Aamer v. Obama*, 742 F.3d 1023, 1030 (D.C. Cir. 2014), as well as claims challenging
certain conditions of confinement where the petition alleges that the "conditions in which
the petitioner is currently being held violate the law[,]" *id.* at 1034-35. The so-called
Petition filed here contains no such claim.

Indeed, the Petition neither challenges the legality of Al-Hawsawi's detention, nor
the conditions of his confinement. Instead, Petitioner improperly attempts to use the writ
of habeas corpus as a discovery tool. The only relief Petitioner seeks is access to medical
information generated during Petitioner's detention and an examination by an
"independent" physician for the purpose of providing Petitioner and his counsel with a
"report on Petitioner's overall current state of health and recommendations regarding his
treatment." Pet. at 12-13. Habeas does not cover claims such as those asserted here,

2

which neither seek release nor changes to an "aspect of [Petitioner's] confinement [that] has deprived him of a right to which he is entitled while in custody." *Id.* at 1036.

Because Petitioner's "claims do not sound in habeas, [his] challenges constitute an action other than habeas corpus barred by section 2241(e)(2)." *Id.* at 1030 (internal quotation marks omitted). Accordingly, it is

**ORDERED** that Petitioner's Motion for Preliminary Injunction [Dkt. # 2] is **DENIED**; it is further

**ORDERED** that the Petition for Writ of Habeas Corpus [Dkt. # 1] is **DISMISSED** without prejudice for want of jurisdiction. This is a final appealable Order.

RICHARD J. LEON
United States District Judge

3

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MUSTAFA AHMED ADAM AL
HAWSAWI,                                          :

        Petitioner,                          :

        v.                                    :    Case:

BARACK OBAMA, et al.,                            :

        Respondents.                         :

### Declaration of Jennifer Williams

I, Jennifer Williams, declare as follows:

1. I am a Lieutenant Colonel in the United States Army Reserve Judge Advocate General's Corps. I am currently on active duty and assigned to the Office of the Chief Defense Counsel for Military Commissions. I have been assigned to Petitioner's military commissions' defense team since July 2012. I have been a practicing attorney for 21 years and a military officer for 19 years. Prior to this assignment, I worked at a private law firm for eight and a half years where as part of my duties I investigated and litigated legal claims resulting from medical malpractice. Prior to that, I was engaged in the private practice of law for two years where I handled criminal and civil cases, to include matters resulting from medical malpractice. In addition to my work experience, I also served as administrative medical specialist in the Ohio and Massachusetts Air National Guard from 1987 to 1993, prior to attending law school. These collective experiences have helped make me conversant with medical terminology and proficient at reading and understanding medical records and reports.

1

2. In my current assignment to Petitioner's military commission defense team, I have reviewed those portions of Petitioner's medical records which the government has allowed to be released, and I have personally met with Petitioner on numerous occasions to discuss his health. Based on my review of Petitioner's medical information, I can attest to the following facts:

a. Chronic Hepatitis C – Petitioner has been diagnosed with Hepatitis C since at least September of 2006. Laboratory test indicated decreased liver function in early 2014 and CT scan revealed some cirrhotic change on the anterior border of the liver in July, 2014. According to the National Institute of Diabetes and Digestive and Kidney Diseases, "Liver cancer is common in people with cirrhosis. Liver cancer has a high mortality rate."[i] It was reported that another U. S. detainee suffering from Hepatitis C and liver problems, Abu Anas Al-Libi, died awaiting Federal trial in New York earlier this year[ii]. Petitioner has not been informed about his current Hepatitis C status, nor about the significance of the cirrhotic changes noted, or overall the condition and prognosis of his liver.

b. Chronic, unexplained blood in Petitioner's Urine – Petitioner had an acute onset of pain associated with urination and the visible presence of blood in his urine beginning July 2014. Test results confirmed the presence of blood (hematuria), protein and bacteria in his urine. Although urinalyses have been conducted on an infrequent and sporadic basis (most recently in 9 July 2015), these tests have consistently identified the presence of blood and the other abnormalities previously noted, in his urine. The cause, however, remains undiagnosed a full year after it first began. Cancer has not been ruled out.

2

c.  Rectal prolapse, chronic hemorrhoids and anal fissures – Petitioner has been diagnosed with

chronic hemorrhoids, anal fissures and rectal prolapse since at least September of 2006.  The

SSCI report describes that these conditions were diagnosed as early as 2003.  The SSCI

report describes his brutal treatment, which included sodomy with a foreign object under the

guise of "rectal exams" conducted with excessive force; this treatment likely resulted in the

physical damage described.



d.



e.

f.

g.

3



h.  Petitioner's overall health has steadily declined over the past eight months.   He is 64" tall and
his weight dropped from 117 lbs. on 30 September 2014 to 98.8 lbs. on 7 January 2015.   Mr.
al Hawsawi's weight has consistently fluctuated around the 100 lbs. mark since January 2015.



i.  I have spoken to the Petitioner during client meetings regarding medical issues and do not find
that he is sufficiently proficient in the English language to discuss medical issues without the
assistance of an interpreter.   Petitioner has informed me that a translator is not always
provided to him during discussions of medical issues.

j.  I have observed the Petitioner exhibiting signs of physical pain and discomfort in client
meetings, most recently on 23 July 2015, which resulted in the early termination of our
attorney-client meetings.   In the past, Petitioner has missed both client meetings and court
proceedings due to his pain.

3.    Based upon the above, I have serious concerns that the medical information and treatment

4

provided to the petitioner are minimally sufficient and believe an independent medical assessment

is immediately necessary.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on:    July 31, 2015.

*Jen Williams*

Jennifer Williams, LTC, JA, USAR

---

[i] Cirrhosis. (2014, March). Retrieved June 25, 2015, from
http://www.niddk.nih.gov/health-information/health-topics/liver-disease/cirrhosis/Pages/facts.aspx

[ii] Dienst, J., & Windrem, R. (2015, January 3). Suspected Plotter of U.S. Embassy Attacks Abu
Anas Al-Libi Dies in New York - NBC News.   Retrieved July 31, 2015, from
http://www.nbcnews.com/news/world/suspected-plotter-u-s-embassy-attacks-abu-anas-al-libi-n27
8866

5

# Exhibit C

~~OFFICER CASE-RELATED MATERIAL~~
~~UNCLASSIFIED~~

Mr. Hawsawi
ISN 10011
LtCol Gleason
for W.B. Ruiz

19 March 2014

Memorandum for the Treating Physician of Mustafa al Hawsawi ISN # 10011

From: Lieutenant Colonel Sean Gleason and Mr. Walter Ruiz

SUBJECT: Medical Treatment Request

1. We are counsel for Mr. al Hawsawi. Mr. al Hawsawi is presently in pre-trial detention and has not been convicted of any crime. As his legal counsel, we frequently come in direct contact with Mr. Hawsawi. This has allowed us the opportunity to observe his physical condition over time, which has been deteriorating. LtCol Gleason attempted to arrange a meeting with you last week, while he was on island at Guantanamo. The Staff Judge Advocate indicated you declined to meet and instead requested that any matters of concern be addressed in writing.

2. It has come to our attention that a breakthrough treatment is now FDA approved for Hepatitis C, a chronic condition that Mr. Hawsawi has been diagnosed with throughout his detention at JTF-GTMO. Please find attached the full prescribing information for the most promising of the medications for Hepatitis C. Genotype 4 of the disease, with which Mr. Hawsawi has been diagnosed, has a high response rate to this treatment. It is suggested that many persons who receive this treatment can be effectively cured. If no treatment is provided, the expectation is that Mr. al Hawsawi will require medical monitoring for the rest of his life, with the potential for developing serious complications – including, but not limited to cirrhosis of the liver, liver cancer and death. Medical records indicate there has been inquiry into potential treatment for Mr. Hawsawi's Hepatitis C since 12/13/2006. There has, however, been no such treatment provided.

3. The treatment described herein indicates a 12 week treatment regimen, with a combination of medications, Sofsburvir (SOVALDI), peg-interferon alfa, and ribavirin, is highly effective. We request that this treatment be discussed with Mr. Hawsawi and be made available to him at his request.

4. As his physician, you have access to his medical records that indicate Mr. al Hawsawi has effectively gone without treatment at JTF-GTMO for over 7 years. Mr. Hawsawi's blood work continues to demonstrate that his liver is compromised and that his Hepatitis C virus is active. As a medical doctor, you are aware this is a treatable chronic disease with highly promising treatment now readily available for many genotypes, including genotype 4.

5. Our understanding is Mr. al Hawsawi is presently desiring treatment for Hepatitis C to alleviate its' symptoms (fatigue, poor appetite, low energy, etc.) which contribute to his chronic pain and to decrease the risk of developing the life-threatening health conditions set out in Paragraph 2.

6. In addition to discussing this treatment with Mr. al Hawsawi, we are requesting that you note your opinion and/or recommendation of this treatment in writing by reviewing and signing the following page. This will allow us to have a record of your opinion should you PCS or change positions.

~~OTHER CASE-RELATED MATERIAL~~
~~UNCLASSIFIED~~

OTHER CASE-RELATED MATERIAL
UNCLASSIFIED

Mr. Hawsawi
ISN 10011
LtCol Gleason
for W.B. Ruiz

Sincerely,

LtCol Sean Gleason, Detailed Military Counsel
For Mr. al Hawsawi

Walter B. Ruiz Jr. Learned Counsel
for Mr. al Hawsawi

OTHER CASE-RELATED MATERIAL
UNCLASSIFIED

OTHER CASE RELATED MATERIAL
UNCLASSIFIED

Mr. Hawsawi
ISN 10011
LtCol Gleason
for W.B. Ruiz

MEDICAL ASSESSMENT

I, _____(name, pseudonym is acceptable), have reviewed the medical literature
on SOVALDI, and believe to a reasonable degree of medical certainty that the 12 week treatment
regimen of Sofsburvir, peg-interferon alfa, and ribavirin is appropriate treatment that could lessen Mr. al
Hawsawi's present symptoms, and possible cure his chronic condition of Hepatitis C. I recommend this
treatment be provided.


_____          _____
Signature                          Date

OTHER CASE RELATED MATERIAL
UNCLASSIFIED

# Exhibit D

UNCLASSIFIED//FOR PUBLIC RELEASE

10 July 2014

Memorandum for Treating Physician Mustafa al Hawsawi ISN # 10011

From Lieutenant Colonel Sean Gleason, Detailed Counsel and Walter Ruiz, Learned for Mr. al Hawsawi

SUBJECT: Request for Immediate Medical Evaluation and Treatment -- **This request contains sensitive medical information not for further release and necessitates HIPAA compliance. This information should only be made available (released) to authorized medical personnel to facilitate the provision of requested care**.

We are very concerned based upon our discussions with Mr. al Hawsawi, recent laboratory results and personal observations of both counsel and an expert consultant with specialized training in pain management that Mr. Hawsawi continues to suffer from steadily deteriorating health due to chronic and acute medical conditions, some of which result in excruciating pain and contribute to decreased sleep and the overall functioning of Mr. al Hawsawi.

Mr. al Hawsawi has asked us to assist him in communicating with the medical personnel currently assigned to diagnose and treat him. Please understand that at this stage of his captivity, counsel for Mr. al Hawsawi now stand in what could be considered the closest relation to a trusted advisor due to our personal and professional relationship over the past five plus years. Whereas a typical patient could normally enlist the assistance of a trusted friend or family member in communicating with medical personnel on sensitive or complex matters, Mr. al Hawsawi is not in a position to rely on typical support systems to assist him. Similarly, we recognize that medical personnel face unique challenges in building rapport and trusting relationships with patients such as Mr. al Hawsawi. Geographic barriers and normal rotation timelines have created difficult obstacles to fostering a long lasting doctor patient relationship. Over the course of the years we have had the opportunity to observe such difficulties and to discuss them with Mr. al Hawsawi. Finally, Mr. al Hawsawi's cultural background, limited command of the English language (in general, and specifically with regards to medical terminology) and unique circumstances make it difficult for him to articulate all of his medical concerns to enable your full understanding of the urgency of his conditions.

Our purpose in reaching out to you is to try to bridge this gap in communication and information and to ensure a clear and comprehensive evaluation of Mr. al Hawsawi's medical complaints in order to facilitate the delivery of treatment for Mr. al Hawsawi. Accordingly, we are requesting that you meet with us so we may discuss your opinions and/or recommendations for each of the following issues. This will help us be able to answer any questions Mr. al Hawsawi may have, and allow us to have a better understanding of his healthcare conditions and your treatment recommendations.

The most urgent and distressing medical condition that Mr. al Hawsawi has reported is what we suspect to be a rectal prolapse from which Mr. al Hawsawi presently suffers. This condition results in excruciating pain that has become almost intolerable. Mr. al Hawsawi has been referring to this condition as "hemorrhoids" because of an apparent lack of understanding of this condition. While he may well also suffer from true hemorrhoids, his self-report indicates that apparently a part of his lower

intestine is routinely being externally exposed necessitating painful manual digital manipulation of the prolapse back into the body after each bowel movement. This condition in conjunction with his additional reports of dark red blood being present in his stool, recent low white and red blood cell counts (lab results of 12 May 2014) and recent unexplained lower than normal body temperatures (lowest recorded temperature being 97 degrees on 23 May 2013), are very troubling. The pain from this condition has also caused Mr. al Hawsawi to limit his intake of food and water so as not to aggravate the condition. Through our discussions with Mr. al Hawsawi, we have learned that he has suffered from this condition for a very long time. It is apparent to us that trust issues as well as limited language capability may have inhibited the free and full discussion of this condition not only with medical personnel but also with legal counsel. Now that the pain from this condition has become intolerable, Mr. al Hawsawi has elaborated further. At this time, this condition is having a direct impact on Mr. al Hawsawi's ability to comfortable meet with his legal counsel and assist in his defense in this capital case. We would like to discuss this issue further and discuss your opinions with respect to a recommended course of treatment. Our research to date indicates that diagnostic imaging (abdominal/colorectal ultrasound and/or other reliable imaging) and an evaluation by a colorectal specialist is appropriate at this stage.4.        On March 12, 2014, we wrote regarding Mr. al Hawsawi's desire for an FDA approved medication for Hepatitis C. As you are aware, an appropriate course of treatment can provide an effective cure for Hepatitis C, an otherwise life-long disease with the potential for causing serious complications – including, but not limited to cirrhosis of the liver, liver cancer and death. Mr. al Hawsawi's medical records indicate there have been questions into potential for treatment for Mr. al Hawsawi's hepatitis C as early as December 13, 2006. However, it appears that there has been no treatment prescribed to date. Mr. al Hawsawi's blood work continues to demonstrate that his liver is compromised and that his Hepatitis C is active (see lab result of 12 May 2014). Now that the FDA-approved treatment regimen of Sofsburvir (SOVALDI) peg-interferon alfa, and ribavirin,) has been consistently demonstrated to be highly effective, Mr. al Hawsawi requests that this treatment be made available to him. We understand Mr. al Hawsawi had a conversation with the Senior Medical Officer (SMO) after the receipt of our March 12, 2014 letter and discussed the possibility of waiting on the FDA approvals of other potential medications. Acknowledging that testing and FDA approvals for new medicines may take considerable time, he now requests the FDA approved treatment regimen of Sofsburvir (SOVALDI), peg-interferon alfa, and ribavirin for his genotype, genotype 4. It is our understanding that treating Hepatitis C patients who will tolerate an approved regimen of medications is the present standard of care and there are no counter-indications for Mr. al Hawsawi to receive this treatment.

5.        Another issue of great concern is Mr.al Hawsawi's continued cervicogenic headaches. Although a CT scan on May 13, 2013 revealed no acute intracranial hemorrhage, it did reveal multi-level degenerative disk disease affecting C4-C5 through C6-C7, most significant at C5-C6. It did not, however, provide a definitive diagnosis for the cause of his cervicogenic headaches. Mr. al Hawsawi still experiences intense cervicogenic headaches regularly and their persistence gives a heightened cause for concern. It appears that an MRI of the brain and cervical spine are medically appropriate at this stage and we would like to request such measures on behalf of Mr. al Hawsawi.

6.    There are a number of additional medical tests that we would like to request as soon as practicable on behalf of Mr. al Hawsawi. Given his medical history and present condition, we believe these tests are important. We certainly would like to discuss your thoughts with respect to these tests. The tests requested are:

    a.    A comprehensive physical exam

    b.    A measurement of height, weight, and body mass index

    c.    A measurement of blood pressure and body temperature

    d.    A thorough dental exam

    e.    A thorough eye exam and visual screening

    f.    A complete audiological examination and audiogram

    g.    A screening of his record of immunizations

    h.    A blood draw for the following blood tests to be performed:

        1.    Complete Blood Count (CBC)

        2.    Fasting Blood Sugar test (Fasting Glucose) and AIC level

        3.    C-Reactive Protein (CRP) test

        4.    A Comprehensive Metabolic Panel

        5.    A Lipid Panel

        6.    A Thyroid Function Test

        7.    HVC-RNA Test

        8.    A Prostate-specific antigen (PSA) test

    i.    A Colorectal Cancer Screening

    j.    A Prostrate Exam

    k.    A stool analysis

    l.    Osteoporosis screening (lab results of May 12, 2014 note vitamin D deficiency)

    m.    A bone density test

    n.    A lung x-ray

o.  In addition to the MRI of the brain and of the Cervical Spine, an MRI of the thoracic and lumbar spine are requested due to complaints from Mr. Hawsawi to counsel of radicular pain going into the lower extremities during bowel movements.

7.      Thank you, in advance, for your consideration. We hope to be able to meet with you in the near future to discuss these important issues. As discussed, our main concern is to ensure that proper communication leads to the best and most timely medical care for Mr. al Hawsawi.

LTC Sean Gleason, Detailed Military Counsel

Walter B. Ruiz Jr. Learned Counsel

# Exhibit E

UNCLASSIFIED//FOR PUBLIC RELEASE

| From | JTFGTMO-SJA-Litigation Support | Date | Monday, August 18, 2014 12:09:05 PM |
|------|-------------------------------|------|-------------------------------------|
| To | Williams, Jennifer N LTC OSD OMC Defense; JTFGTMO-SJA-Litigation Support | | |
| Cc | | | |

**Subject** RE: ISN 10011

📄**ISN 10011 Request (18Aug14).pdf** (32 KB HTML ) 📄**Appendix A to SOP 11 – 10 March 2014.pdf** (179 KB HTML )

ALCON,

RE: ISN 10011 special request.

1. Attached, please find the special request form indicating action taken by the JDG commander.

2. Attached, please find Appendix A to SOP 11.

V/R
LSS

-----Original Message-----
From: Williams, Jennifer N LTC OSD OMC Defense [mailto:Jennifer.Williams█████
Sent: Monday, August 18, 2014 10:54 AM
To: JTFGTMO-SJA-Litigation Support
Subject: RE: ISN 10011

LSS- I requested your assistance in meeting with the medical provider.  Is
my request denied because the medical provider has refused to meet with me,
or has the request been denied without consulting the medical provider? If
the request has been denied on its face (without consulting the medical
provider) please provide me with the reason.  If the medical provider has
refused to meet with me, please provide confirmation.  In addition, can you
please provide a copy of any guidance and SOP(s) regarding any restrictions
on items that can provided to detainees, in general, and HVD's, in
particular.  There have been items refused (food items, foam mattress
topper, scarf) and I request any and all guidance and SOP(s) available at
your earliest convenience for future submissions.  Thank you very much.  R/
LTC Williams

-----Original Message-----
From: JTFGTMO-SJA-Litigation Support
Sent: Monday, August 18, 2014 10:38 AM
To: JTFGTMO-SJA-Litigation Support; Williams, Jennifer N LTC OSD OMC Defense
Subject: RE: ISN 10011

ALCON,

RE: ISN 10011 special request.

1. Your special request to meet with ISN 10011's medical specialist is
DENIED.

V/R
LSS

-----Original Message-----
From: JTFGTMO-SJA-Litigation Support
Sent: Monday, August 18, 2014 9:22 AM
To: 'Williams, Jennifer N LTC OSD OMC Defense'; JTFGTMO-SJA-Litigation
Support
Subject: RE: ISN 10011

12/12/2014

ALCON,

RE: ISN 10011 special request.

1. JTF-GTMO has received and is processing your request.

V/R
LSS

-----Original Message-----
From: Williams, Jennifer N LTC OSD OMC Defense
[mailto:Jennifer.Williams███████]
Sent: Monday, August 18, 2014 9:03 AM
To: JTFGTMO-SJA-Litigation Support
Subject: RE: ISN 10011

LSS- Please see attached commissions form. Thank you very much for your
assistance. R/ LTC Jennifer Williams, Asst. Detailed Defense Counsel

-----Original Message-----
From: JTFGTMO-SJA-Litigation Support
Sent: Monday, August 18, 2014 6:31 AM
To: Williams, Jennifer N LTC OSD OMC Defense; JTFGTMO-SJA-Litigation Support
Subject: RE: ISN 10011

ALCON,

RE: ISN 10011 special request.

1. Please submit a commissions special request form.

2. One has been attached.

V/R
LSS

-----Original Message-----
From: Williams, Jennifer N LTC OSD OMC Defense
[mailto:Jennifer.Williams███████]
Sent: Sunday, August 17, 2014 4:39 PM
To: JTFGTMO-SJA-Litigation Support
Subject: ISN 10011

Litigation Support- I would like to meet briefly with the medical specialist
on Island that is performing a medical procedure on Mr. Hawsawi. Please
forward this request and let the provider know I am on island and available
this evening, all day and evening tomorrow and early morning on Tuesday.
Please provide a response at your earliest convenience. Thank you very
much. R/


Jennifer N. Williams

LTC, JA, USAR

Office of Chief Defense Counsel

for Military Commissions

1620 Defense Pentagon

12/12/2014

## JTF-GTMO Commissions Attorney Request Form

Date: 18 August 2014

From: LTC Jennifer N. Williams

ISN: 10011

Subject: Request to speak to medical provider

I request the following assistance from Joint Task Force Guantanamo Bay:

I would like assistance to meet briefly with the medical specialist on island that performed a medical procedure on Mr. Hawsawi. Please forward this request and let the provider know I am on island and available all day and evening today and early morning on Tuesday. I can be reached ████████████ Please provide a response at your earliest convenience. Thank you very much.

**Justification:**

Mr. Hawsawi had a medical procedure on 17 Aug 2014. Mr. Hawsawi also has chronic health conditions that require monitoring and treatment. At his request, his learned counsel and detailed counsel have been assisting him in requesting necessary diagnostic treatment and care. Mr. Hawsawi also relies on his counsel, with the assistance of an interpreter, to review the results of medical tests and procedures to more fully understand them. The physician who performed the medical procedure is in the best position to discuss the results of the medical procedure, which was scheduled based upon serious medical concerns. Prior diagnostic testing did not identify the cause of an acute medical condition. Counsel is very concerned about Mr. Hawsawi's deteriorating health. Speaking with the medical provider who performed the procedure will provide counsel timely results of the procedure and alert them to any findings that require further medical consult and treatment, that may require the assistance of counsel to get addressed adequately and expeditiously. It will also allow counsel to aid Mr. Hawsawi in more fully understanding the results of the procedure. I understand that arrangements made as a result of this request are subject to cancellation or change without notice.

Requestor /Lt. Dch Learned Counsel    Date 18 Aug 2014

JDG Commander    Date 18 AUG 2014

**Request:**    ☐ Approved

☒ Denied

GTMO L-FORM 2 (JAN 14)

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit F

MILITARY COMMISSIONS TRIAL JUDICIARY
GUANTANAMO BAY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KHALID SHAYKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BIN AL SHIBH, ALI ABDUL AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | AE 332(MAH)<br><br>Defense Emergency Motion for Appropriate Medical Intervention and Return of Legal Files<br><br>Filed: 15 December 2014 |

1. **Timeliness:**  This motion is timely filed pursuant to the Trial Judiciary Rules of Court, Rule 3.7(b).

2. **Relief Sought:**  The Defense moves this Commission for an Emergency Order compelling: the immediate return of Mr. al Hawsawi's medical devices and medications; immediate and appropriate medical testing to determine the exact source of blood in Mr. al Hawsawi's urine;[1] release of all medical records to date to counsel and to Mr. al Hawsawi's treating physician(s); a meeting with Mr. al Hawsawi's physician(s); and an order to medical personnel to provide whatever immediate medical procedures are necessary under established standards of care in order to remedy Mr. al Hawsawi's severe and chronic (long-standing) medical conditions.  Mr. al Hawsawi also seeks an order from the Commission directing JTF-GTMO to return Mr. al Hawsawi's legal bins and to immediately cease further interference with his access to legal materials.

---

[1] It is possible that the cause of the bleeding is cancer. Though JTF medical personnel are aware of this possibility, no further testing has been conducted and no efforts at ruling out cancer have been made.  Since time is of the essence in properly diagnosing and treating cancer, immediate additional testing is necessary. *See* att. C Lab results for 23 Jul 14, 28 Jul 14 and 5 Aug 14 noting the presence of blood in Mr. al Hawsawi's urine.

3. **Overview**: ██████████████ Mr. al Hawsawi was subjected to a rough take down ██████ ██████████████████████████ This event has exacerbated chronic medical conditions from which Mr. al Hawsawi suffers. Mr. al Hawsawi weighs a mere 117 lbs. and is 5' 4 1/2" inches tall. At the time of the take down, Mr. al Hawsawi was ████████ suffering from debilitating side effects from medication he has recently been receiving for Hepatitis C. The side effects from this medication include weakness, fatigue, dizziness, and nausea.[2] This recent event, combined with a history of deficient medical care for Mr. al Hawsawi's acute and chronic medical conditions, warrants urgent judicial intervention. The Camp Commander's orders to strip Mr. al Hawsawi of prescribed medical devices and medicine and deny him access to legal material, violate domestic and international law and the standing communications order in this case, AE 018U, warranting urgent judicial intervention.

Without an immediate order for appropriate medical intervention[3], Mr. al Hawsawi will continue in his severe and significant medical deterioration that is rapidly becoming life-threatening. In addition, withholding legal material from him violates his statutory and Fifth and Sixth Amendment rights to due process, to prepare and present a defense and to receive the effective assistance of counsel.

4. **Burden and Standard of Proof**: The burden of persuasion on this motion rests with the Defense. R.M.C. 905(c).

---

[2] Mr. al Hawsawi had reported all of these side effects, as well as loss of appetite, to counsel PRIOR to the rough take down by JTF-GTMO Guard Force Personnel ████████████
[3] On 21 May 2014, Mr. al Hawsawi moved to have his case severed from that of the other four accused in order that the commission could address longstanding motions affecting Mr. al Hawsawi's case. See AE 299. In in AE 302B(MAH), 322A(MAH) and 322D(MAH) Mr. al Hawsawi has continued to affirm that request.

2

5. **Facts:**

    a. Mr. al Hawsawi suffers from chronic and severe medical conditions including hemorrhoids, anal fissures, rectal prolapse, Hepatitis C, cervical degenerative disk disease, migraines and lower back pain. *See* att. B, Medical Summary of May 2014. The recently released Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and Interrogation Program reveals the CIA's awareness of reports of "excessive force" in rectal exams as well as the determination that such exams were an effective means of behavioral control. Mr. al Hawsawi was later diagnosed with chronic hemorrhoids, anal fissures, and symptomatic rectal prolapse."[4] This condition has never been remedied.

    b. In July of 2014 Mr. al Hawsawi experienced an acute onset of a still undiagnosed condition or conditions causing him significant pain accompanied by blood in his urine. Diagnostic laboratory tests confirmed the abnormal presence of blood and bacteria in his urine and low red cell, white blood cell and platelet counts beginning 23 July 2014. *See* att. C, Lab Results from 23 July 2014 – 29 Nov 2014. These same abnormalities, with the exception of the low platelet count, were identified through urine and blood tests obtained 28 July 2014 and 05 Aug 14.

    c. The results of Mr. al Hawsawi's cystoscopy specimen testing indicate "Atypical. Scant specimen (meaning poor quality and insufficient) consists of few multicellular groups/fragments or urothelial cells. Comment: Differential diagnosis included infectious process, stones, instrumentations and low grade bladder tumors. Clinical correlation is recommended." *See* att.

---

[4] *See* Footnote 584, SSCI Torture Report Executive Summary, Findings & Conclusions (released 9 Dec 2014). Senate Select Committee on Intelligence, Committee Study of the Central Intelligence Agency's Detention and Interrogation Program: Foreword by Senate Select Committee on Intelligence Chairman Dianne Feinstein; Findings and Conclusions; Executive Summary (approved 13 Dec 2012) (updated for release 3 Apr 2014) (declassification revisions 3 Dec 2014) available at http://www.intelligence.senate.gov/study2014/sscistudy1.pdf (accessed 9 Dec 2014).

3

D, Urine Cytology Report 26 Aug 14. The results of this test did not rule out the possibility of cancer as the source.

d. On 30 July 2014 CT Scans were conducted which identified, among other findings, multiple hyper densities in the kidney, kidney stones, cirrhotic change in his liver, and multiple focal calcifications in and surrounding the midline urethra. *See* att. E, Results from CT Scans done on 30 July 2014.

e. Mr. al Hawsawi has confirmed that no further urine tests have been conducted although the cause of his pain and the blood and abnormal discoloration of his urine remain unidentified and undiagnosed. [5] It appears the JTF-GTMO solution to continually abnormal laboratory tests results is simple, stop testing Mr. al Hawsawi. As the possibility of cancer has not been ruled out, the willful disregard for Mr. al Hawsawi's medical needs and the decision to ignore his symptoms is unacceptable.

f. While urinary testing ceased, blood tests continued. While continued blood tests are appropriate for Mr. al Hawsawi, they are not a substitute for urine tests. These blood tests continue to show abnormally low red and white blood cell counts which can be indicative of an on-going infectious process, a weakened immune system, nutritional deficiencies and disease. The cause(s) of these abnormal values is also still unknown. *See* att. C Lab results noting low red and white blood cells on 23 Jul 14, 28 Jul 14, 5 Aug 14, 2 Oct 14, 10 Oct 14, 24 Oct 14 and 29 Nov 14.

g. Of additional great concern is that during this same period Mr. al Hawsawi finally began receiving active treatment for his chronic Hepatitis C in the form of a combined

---

[5] While Defense counsel has asked for updated medical records, the Prosecution has not provided them completely or in timely manner. Counsel only yesterday were provided select medical reports dating from June 2014 through 11 Aug 2014. These reports had only 1 lab result, the one from 5 Aug 14. All the attached documents (with the exception of the medical summary) were received directly from Mr. al Hawsawi. Mr. al Hawsawi confirmed no further urine samples were requested.

4

medication regimen. As with any new regimen, the recipients' overall physical well-being is an important factor in the regimen's effectiveness.

h. Mr. al Hawsawi may finally be able to undergo a much needed medical surgery. However, it is unclear whether Mr. al Hawsawi's current physicians even have access to medical records from 2003-2006, during which time Mr. al Hawsawi's suffered the initial injury at the CIA's torture facilities.[6] Numerous letters by counsel requesting to speak to Mr. al Hawsawi's physician(s) have gone unanswered. Mr.al Hawsawi's counsel have also repeatedly requested discovery of all medical records, including these records, but they have not been provided to date.

i.          Mr. al Hawsawi was subjected to a rough take down          This recent event has exacerbated medical conditions from which Mr. al Hawsawi suffers. Mr. al Hawsawi's counsel has asked that the circumstances surrounding this incident be investigated. On December13, Mr. Robert Swann informed counsel that the incident "has already been investigated."

j. Due in large part to the effects from this take down, Mr. al Hawsawi cancelled the morning attorney meeting on December 8th, terminated early the attorney meeting on the 10th of December and cancelled entirely the meetings on the 11th.

k. Mr. al Hawsawi, weighs 117 lbs. and stands 5' 4 1/2" inches. Mr. al Hawsawi was          and was under the influence of debilitating side effects from medication he is receiving for chronic Hepatitis C. These side effects include weakness, fatigue, dizziness, and nausea.

---

[6] *See* p. 154 Unclassified Summary of the Senate Select Committee on Intelligence Report noting, "After failing to gain assistance from the Department of Defense, the CIA was forced to seek assistance from three third-party countries in providing medical care to al-Hawsawi and four other CIA detainees with acute ailments."

l. After this take down, Mr. al Hawsawi was stripped of prescribed medical devices and medication and denied access to legal material contained in his legal bins.

6. **Law and Argument:**

**A. The Geneva Convention Relative to the Treatment of Prisoners of War requires the United States provide necessary medical care.**

The Treatment of Prisoners of War requires Mr. al Hawsawi's be provided necessary medical care by physicians qualified to diagnosis and treat him or to transfer him to a medical facility that can adequately address his medical issues. Article 30 of the Geneva Convention Relative to the Treatment of Prisoners of War (Geneva Convention III) provides, in part:

Prisoners of war suffering from serious disease, or whose condition necessitates special treatment, a surgical operation or hospital care, must be admitted to any military or civilian medical unit where such treatment can be given... Special facilities shall be afforded for the care to be given to the disabled, in particular to the blind, and for their rehabilitation, pending repatriation. Prisoners of war shall have the attention, preferably of medical personnel on of the Power on which they depend and, if possible, or their own nationality....

**Article 30, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.**

Article 13 provides, in part:

Prisoners of War must at all times be humanely treated and provided the medical attention required by their state of health. Any unlawful act or omission by the Detaining Power causing death or seriously endangering the health of a prisoner of war in custody is prohibited, and will be regarded as a serious breach of the present Convention. In particular, no prisoner of war may be subjected to physical

6

mutilation or to medical or scientific experiments of any kind which are not justified by the medical, dental or hospital treatment of the prisoner concerned and carried out in his interest.

**Article 13, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.**

And Article 15 provides, in part:

The power detaining prisoners of war shall be bound to provide free of charge for their maintenance and for the medical attention required by their state of health.

**Article 15, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135.**

While the United States has consistently declined to recognize detainees such as Mr. al Hawsawi as prisoners of war, our government has nevertheless advanced the position that detainees are held and treated in accordance with the medical provisions of the Convention.[7] On September 28, 2012, BG Mark Martins remarked in a speech before the Royal Institute of International Affairs, Chatham House, London, "…it should not be overlooked that all three branches of government in the United States now regard military commissions as being bound to comply with the requirement of Common Article 3 of the Geneva Conventions of 1949."

This is the time for the government to make good on that promise. Depriving Mr. al Hawsawi of approved necessary medical devices and prescribed medication, violates the Geneva Convention. Immediate and appropriate medical testing to determine the exact source of blood in Mr. al Hawsawi's urine and to rule out life threatening conditions such as cancer is mandated by Mr. al Hawsawi's documented state of health. Willful disregard for Mr. al Hawsawi's medical needs and denial of necessary testing similarly runs afoul of our obligation to treat all

---

[7] DoD Directive 2310.01E "DoD Detainee Program," August 19, 2014

7

detainees humanely and to provide the requisite level of medical care mandated by their state of health. The Military Judge should order that this practice be immediately ceased and that Mr. al Hawsawi receives the necessary treatment by a qualified physician to determine the unknown medical condition(s) causing the presence of blood, protein and bacteria in his urine that are indicative of a serious medical crisis.

**B. The Geneva Convention Relative to the Treatment of Prisoners of War requires the United States provide Mr. al Hawsawi reports of his past medical treatment in CIA custody in order to make informed decisions about his current medical condition.**

The Geneva Convention Relative to the Treatment of Prisoners of War also requires that Mr. al Hawsawi be provided medical reports of his past medical treatment.

Article 30 goes on to provide, in part:

Prisoners of war may not be prevented from presenting themselves to the medical authorities for examination. *The detaining authorizes, shall upon request, issue to every prisoner who has undergone treatment, an official certificate indicating the nature of his illness or injury, and the duration and kind of treatment received...*

**Article 30, Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135**

Mr. al Hawsawi has requested access to all his medical records including but not exclusive to those from 2003-2006. To date, all of his records have not been provided. Mr. al Hawsawi has previously executed an authorization form requesting that all medical records be provided to his counsel.[8] These records are necessary so that Mr. al Hawsawi may make a fully informed decision regarding any potential medical procedures and so that his counsel can appropriately and in a timely manner specifically challenge deficient aspects of his care. These

---

[8] A signed medical authorization for Defense counsel to receive Mr. Hawsawi's medical treatment records will be provided if the Military Judge determines this is necessary.

records should be immediately provided to Mr. al Hawsawi through his defense team with the "releasable to ISN 10011" markings applied, so that we may share and discuss the documents with Mr. al Hawsawi. Since a complete medical history is essential to Mr. al Hawsawi making an informed decision regarding any surgery, it is also requested that the defense be provided with all of Mr. al Hawsawi's medical records over the last 12 months with the "releasable to ISN 10011" markings applied. The Commission should also order that counsel be afforded the opportunity to meet with the treating physician(s) to ascertain the information available to the medical provider, his or her qualifications, and his or her recommended treatment plan. It is important to understand that legal counsel stand in the position of closest trusting relationship available to Mr. al Hawsawi at this time. Given Mr. al Hawsawi's brutal history of detention and maltreatment, which included the direct involvement of medical personnel, it is understandable that he would seek to consult with those he trusts most in this setting.

Defense counsel have recently attempted to meet with one of Mr. al Hawsawi's medical providers but this request was denied by the JDG Commander. *See* att. F Aug 18, 2014 Denial to Meet with Medical Provider and communication of such denial by the JTF-GTMO Litigation Support Staff. Counsel have also made repeated attempts to communicate with Mr. al Hawsawi's medical providers through correspondence, but those letters have gone unanswered. Finally, the prosecution has indicated that until counsel sign the MOU additional records will not be provided. With regards to Mr. al Hawsawi's medical records, the recent exposure of the CIA brutal methods and the medical consequences of those methods should alleviate the prosecution's need to continue to withhold relevant medical information necessary for timely and effective medical intervention. This Commission must act now in order to safeguard the health of Mr. al Hawsawi and ensure that he receives timely and appropriate medical treatment.

9

Failure to act will allow Mr. al Hawsawi's health to continue to deteriorate without timely and appropriate intervention and will increase the likelihood of a more severe condition which could result in death.

### C. Denying Mr. al Hawsawi access to his legal material violates AE 018U and his statutory and Fifth and Sixth Amendment rights to due process, to prepare and present a defense, to confront his accusers, and to receive the effective assistance of counsel.

Mr. al Hawsawi's legal materials have been segregated and his access to the vast majority of legal materials has been denied. This violates the written communications order in this case, AE 018U, and warrants urgent judicial action. Withholding legal material from Mr. al Hawsawi violates his statutory and Fifth and Sixth Amendment rights to due process, to prepare and present a defense and to receive the effective assistance of counsel.

AE 018U permits searches of the legal bins for contraband, but does not authorize the removal of attorney-client and other-case-related material as an administrative punishment.[9] Mr. al Hawsawi and his Defense counsel must continually communicate regarding legal decisions. This ongoing communication necessitates Mr. al Hawsawi's access to his legal materials. Withholding Mr. al Hawsawi's access to his legal bins interferes with the attorney client relationship and his statutory and Fifth and Sixth Amendment rights to due process, to prepare and present a defense and to receive the effective assistance of counsel.

7. **Conclusion:** The Defense requests that this Commission issue an oral ruling followed by a conforming order that compels the immediate return of Mr. al Hawsawi's medical devices and medications and orders Mr. al Hawsawi's treating physician(s) to provide the necessary, proper and timely medical tests and procedures consistent with generally accepted standards of care in order to remedy severe and chronic long-standing medical conditions. The Commission should

---

[9] AE 018U, para. 11.

10

order that Mr. al Hawsawi's physician(s) take immediate and appropriate medical action in order to determine the exact source of blood in Mr. al Hawsawi's urine as well as make available long delayed necessary surgical procedures. The Commission must order the release to defense counsel and Mr. al Hawsawi's treating physicians of all medical records to date including medical records for the period of 2003-2006. Similarly the commission must order that Mr. al Hawsawi's treating physician(s) including specialist meet with Mr. al Hawsawi's counsel in order to assist Mr. al Hawsawi to make informed medical decisions. Finally, Mr. al Hawsawi also seeks an order from the Commission directing JTF-GTMO to return Mr. al Hawsawi's legal bins and to immediately seize interference with his access to all legal materials.

8. **Request for Oral Argument:** Defense requests the Commission address this issue in court on 16 December 2014 and requests oral argument.

9. **Request for Witnesses:** Mr. al Hawsawi requests production of the following witnesses: Staff Judge Advocate JTF GTMO, JTF Senior Medical Officer, Mr. al Haswsawi's treating physician(s) including any specialists, Camp Commander High Value Detainee Facility, Assistant Watch Commander High Value Detainee Facility.

11

10. **Conference with Opposing Counsel:** Prosecution responds as follows:

- objects to addressing this as an emergency motion outside normal course of business.

- believes that the requested relief with regards to return of medical devices is Moot.

- believes that the request for additional immediate and appropriate medical testing for blood in

Mr. al Hawsawi's urine is not ripe.

- objects to release of classified medical records without a signed MOU from the defense. But

will continue to provide unclassified records of treatment.

- believes the request to meet with Mr. al Hawsawi's physicians is not ripe for adjudication.

- believes that the request to provide whatever immediate medical procedures are necessary

under established standards of care in order to remedy Mr. al Hawsawi's medical conditions, is

not ripe for adjudication.

-believes that Claim for return of legal bins is moot.

11. **Attachments:**

    A.   Certificate of Service;

    B.   Medical Summary of May 2014*;

    C.   Lab Results from 23 July 2014 – 29 Nov 2014*;

    D.   Urine Cytology report 26 Aug 2014*;

    E.   Results from CT Scans done on 30 July 2014*;

    F.   Aug 18, 2014 Denial to Meet with Medical Provider communicated by the JTF-GTMO Litigation Support Staff.

12

# Exhibit G

MILITARY COMMISSIONS TRIAL JUDICIARY
GUANTANAMO BAY

| | |
|---|---|
| UNITED STATES OF AMERICA | **AE 340(MAH)** |
| v. | **Defense Motion** |
| KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BIN AL SHIBH, ALI ABDUL-AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | To Depose Mr. al Hawsawi's Health Care Providers |
| | Filed: 23 January 2015 |

1. **Timeliness**:  This request is filed within the timeframe established by Rule for Military Commission (R.M.C.) 905.

2. **Relief Sought**:   Pursuant to R.M.C. 702(a), the defense for Mr. al Hawsawi requests the deposition of three of Mr. al Hawsawi's health care providers concerning Mr. al Hawsawi's ongoing serious medical conditions.  The defense does not know the identities of these personnel other than the fact that one is the prior Senior Medical Officer (SMO) for Camp 7 who recently departed Guantanamo, one is the current SMO for Camp 7, and one is a gastrointestinal specialist currently assigned to Guantanamo.  The defense respectfully requests that the deposition be allowed to take place at the Naval Station Guantanamo Bay, Cuba, in a suitable facility where the deposition may be recorded (both audio and video recordings) and Mr. al Hawsawi may be present for the depositions.

3. **Overview**: Mr. al Hawsawi suffers from chronic and severe medical conditions including: blood in his urine and stool, hemorrhoids, anal fissures, rectal prolapse, Hepatitis C, cervical degenerative disk disease, migraines, and lower back pain. These conditions were previously described in AE 332(MAH), Defense Emergency Motion for Appropriate Medical Intervention

1

and Return of Legal Files. The defense believes some of these conditions may be life threatening.[1]
The defense has made repeated attempts to speak directly to Mr. al Hawsawi's treating health care
providers for months, but these attempts have been refused by the SJA or ignored by the
physicians.

There are several exceptional matters that now require deposition of these personnel.
First, given Mr. al Hawsawi's declining physical state, perhaps caused by life-threatening illnesses,
time is of the essence to develop a record which can be used to expeditiously resolve the issues
currently pending before the Commission on the Defense Emergency motion. Given the
seriousness of Mr. al Hawsawi's conditions and his deteriorating health, it is not clear that Mr. al
Hawsawi has even been provided the most minimally acceptable medical standard of care.
Depositions are required to develop a factual record on these points. To the extent that minimally
acceptable medical care has been provided (as argued by the Prosecution in their response), this
care is not documented in Mr. al Hawsawi's medical records that have been provided, making the
physicians themselves the best source of evidence to develop a factual record. Further, given the
constant rotation of physicians in and out of Guantanamo and the delays in hearing motions in this
case, depositions are necessary to develop a factual record. The alternative is to call these
witnesses to the stand to establish these facts.

As Mr. al Hawsawi's health has declined over the last year, he requested his defense
counsel to communicate on his behalf with his health care providers - to help him better
understand the extent and nature of his health conditions, the available options to pursue for these
conditions, and the treatment plan for these conditions. But defense counsel's requests to
communicate with Government health care providers, for this most basic of humane treatments —

---

[1] Mr. Abu al-Libi, while being held for trial, died on 2 January 2015 from liver disease and Hepatitis C related
complications. Please see paragraph 6(b)(iv) below.

2

appropriate medical care, have been unsuccessful. Depositions of these health care personnel are necessary to have Mr. al Hawsawi's health status and treatment plan described in full, on the record given the lack of access to his physicians. Also, it is important to preserve the factual record while these personnel are available. These depositions will create a factual record that will make these issues unequivocally clear to the Commission so that judicial intervention may occur before Mr. al Hawsawi's health deteriorates further. Given his declining physical condition, time is of the essence.

4. **Burden and Standard of Proof**: The burden of persuasion on this motion rests with the Defense. R.M.C. 905(c).

5. **Facts**:

a. AE 332(MAH), Defense Emergency Motion for Appropriate Medical Intervention and Return of Legal Files, filed 15 December 2014, describes Mr. al Hawsawi's serious medical conditions. In AE 332 the defense described that Mr. al Hawsawi weighed 117 pounds. On 19 January 2015, he weighed 101.1 pounds. He continues to see blood in his urine[2] and stool. Routine tests to identify the source of this blood have not been performed.[3]

b. Mr. al Hawsawi suffers from chronic and severe medical conditions including hemorrhoids, anal fissures, rectal prolapse, Hepatitis C, cervical degenerative disk disease, migraines and lower back pain. *See* att. B, Medical Summary of May 2014. The recently released

---

[2] It is possible that the cause of the bleeding is cancer. Though JTF medical personnel are aware of this possibility, no further testing has been conducted and no efforts at ruling out cancer have been made. Since time is of the essence in properly diagnosing and treating cancer, immediate additional testing is necessary. *See* att. C Lab results for 23 Jul 14, 28 Jul 14 and 5 Aug 14 noting the presence of blood in Mr. al Hawsawi's urine. *See also*, **Blood in urine (hematuria)** http://www.mayoclinic.org/diseases-conditions/blood-in-urine/basics/definition/con-20032338 (last visited January 13, 2015).

[3] On 14 January 2015, Mr. al Hawsawi indicated that his blood and urine had not been tested since 19 December 2014, and the SMO for Camp 7 told Mr. al Hawsawi that a new Standard Operating Procedure (SOP) prohibits him from sharing the results with Mr. al Hawsawi.

3

Senate Select Committee on Intelligence Study of the Central Intelligence Agency's Detention and Interrogation Program documents the cause of some of these conditions. The report reveals Mr. al Hawsawi was apparently sodomized, by means of "excessive force" with foreign objects in ways that led to "chronic hemorrhoids, an anal fissure, and symptomatic rectal prolapse."[4] The government seeks to camouflage what is plainly aggravated sexual abuse under the guise of "rectal rehydration," an archaic procedure universally decried as unnecessary.[5] CIA medical officers acknowledged the benefits of this technique as a means of behavioral control.[6] Mr. al Hawsawi was also refused emergency medical care by both "Country [deleted] officers" and Department of Defense medical personnel[7] and "had care delayed for serious medical issues."[8]

c. In July of 2014 Mr. al Hawsawi experienced an acute onset of a still undiagnosed condition or conditions causing him significant pain accompanied by blood in his urine. Diagnostic laboratory tests confirmed the abnormal presence of blood and bacteria in his urine and low red cell, white blood cell and platelet counts beginning 23 July 2014. *See* att. C, Lab Results from 23 July 2014 – 29 Nov 2014. These same abnormalities, with the exception of the low platelet count, were identified through urine and blood tests obtained 28 July 2014 and 05 Aug 14.

---

[4] Executive Summary at 100 n.584.

[5] According to Dr. Thomas Burke, an emergency doctor who teaches at Harvard Medical School, this antiquated practice is never used nowadays. "For all practical purposes, it's never used. . . No one in the United States is hydrating anybody through their rectum. Nobody is feeding anybody through their rectum. . .That's not a normal practice." Domenico Montarno, *Is Rectal Feeding an Actual Modern Medical Practice?*, PBS.org (Dec. 12, 2014), http://www.pbs.org/newshour/rundown/rectal-rehydration-medical-practice-used-todays-doctors/.

[6] Executive Summary at 100 n. 584.

[7] *Id.* at 154.

[8] *Id.* at 493. It should be noted that the Department of Defense is still refusing to provide Mr. al Hawsawi with adequate medical care. *See* AE 332 (MAH).

4

d. The results of Mr. al Hawsawi's cystoscopy specimen testing indicate "Atypical. Scant specimen (meaning poor quality and insufficient) consists of few multicellular groups/fragments or urothelial cells. Comment: Differential diagnosis included infectious process, stones, instrumentations and low grade bladder tumors. Clinical correlation is recommended." *See* att. D, Urine Cytology Report 26 Aug 14. The results of this test did not rule out the possibility of cancer as the source.

e. On 30 July 2014 CT Scans were conducted which identified, among other findings, multiple hyper densities in the kidney, kidney stones, cirrhotic change in his liver, and multiple focal calcifications in and surrounding the midline urethra. *See* att. E, Results from CT Scans done on 30 July 2014.

f. No further urine testing was done on Mr. al Hawsawi from August until after the Defense filed an emergency motion on 15 December 2014. *See* AE 332. This prompted JTF-GTMO to test Mr. al Hawsawi's urine on 19 December 2014.[9] Mr. al Hawsawi has confirmed that no further urine tests have been conducted since 19 December 2014, although the cause of his pain and the blood and abnormal discoloration of his urine remain unidentified and undiagnosed. As the possibility of cancer has not been ruled out, the willful disregard for Mr. al Hawsawi's medical needs and the decision to ignore his symptoms is patently unacceptable.

g. JTF-GTMO also has ceased testing Mr. al Hawsawi's blood. Prior to the Defense filing AE 332, Mr. al Hawsawi's blood was tested every two weeks. These tests consistently showed abnormally low red and white blood cell counts, which can be indicative of an on-going infectious process, a weakened immune system, nutritional deficiencies, and disease. The cause(s)

---

[9] In response to the Defense filing AE 332 seeking emergency medical intervention, the SOP for Camp 7 was changed to prohibit medical personnel from providing Mr. al Hawsawi with copies of his own medical testing results. Therefore, the Defense is unaware of the results of the 19 December 2014 test.

5

of these abnormal values is also still unknown. *See* att. C Lab results noting low red and white blood cells on 23 Jul 14, 28 Jul 14, 5 Aug 14, 2 Oct 14, 10 Oct 14, 24 Oct 14 and 29 Nov 14. However, the last blood test conducted on Mr. al Hawsawi was on 19 December 2014. This is of great concern.

     h. Defense counsel's repeated attempts to speak directly with Mr. al Hawsawi's medical care providers have been unsuccessful:

          i. Defense counsel verbally requested to meet with Mr. al Hawsawi's treating physician in March 2014. The JTF-GTMO Staff Judge Advocate (SJA) informed defense counsel that this individual declined to meet with defense counsel. On 19 March 2014, defense counsel followed up this verbal request with a memorandum raising the issue of the treatment for Mr. al Hawsawi's Hepatitis C condition in particular, and his overall health in general. *See* att. F., Memorandum for the Treating Physician of Mustafa al Hawsawi ISN #10011, 19 Mar 2014.

          ii. On 10 July 2014, defense counsel again requested to speak with treating medical personnel, this time via a letter that Mr. al Hawsawi delivered directly to the medical care provider. *See* att. G, Memorandum for Treating Physician Mustafa al Hawsawi ISN #10011, 10 Jul 2014. This request went unanswered.

          iii. On 18 August 2014, defense counsel submitted a special request to the JDG Commander to speak with Mr. al Hawsawi's medical provider. This request was denied. *See* att. H., Denial to Meet with Medical Provider communicated by the JTF-GTMO Litigation Support Staff, 18 Aug 2014.

6. **Law and Argument**:

     a. Pursuant to R.M.C. 702(a) "a deposition may be ordered whenever, after swearing of charges, due to exceptional circumstances of the case it is in the interest of justice that the

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE   JA 43

testimony of a prospective witness be taken and preserved for use at a military commission." A

request for a deposition may be denied for good cause. R.M.C. 702(c)(3)(A).

> "Good cause for denial includes: failure to state a proper ground for taking a deposition; failure to show the probable relevance of the witness' testimony, or that the witness' testimony would be unnecessary. The fact that a witness will be available for trial is good cause for the denial in the absence of unusual circumstances, such as when the Government has improperly impeded defense access to a witness."

R.M.C. 702(c)(3)(A) Discussion.

   b. Pursuant to R.M.C. 702(c)(2), the following information is provided:

      i. Requirements:

Name and address of person whose deposition is requested:

Names (or if name is unknown, description of the office or position of the person):

Names are unknown. Description is thought to be:
          1. Most recent prior SMO for Camp 7
          2. Current SMO for Camp 7
          3. Current Gastrointestinal Specialist at Guantanamo

   Address: JTF-GTMO

      ii. Whether an oral or written deposition is requested: An oral deposition,

recorded via audio and video, is requested.

      iii. Statement of the matters on which the person is to be examined:

      Depositions of Mr. al Hawsawi's treating health care providers are required in

order to ascertain the full extent of Mr. al Hawsawi's medical conditions, treatment status, and

treatment plan. In particular, the depositions will explore the matter of the presence blood in Mr.

al Hawsawi's urine and stool; a detailed explanation of his recent medical tests, including: the 30

July 2014 CT scan, cystoscopy specimen testing, and blood and urine testing results (or lack

thereof); and prognosis and treatment plan for his hemorrhoids, anal fissures, rectal prolapse,

7

Hepatitis C, cervical degenerative disk disease, migraines, and lower back pain. The defense also intends to explore the viability of surgery to mitigate any of these conditions, and determine why routine testing has not been conducted.

iv. Statement of the reasons for taking the deposition:

Time is of the essence, and the Prosecution has opposed addressing AE 332 in as an emergency matter. Mr. al Hawsawi may be suffering from life-threatening illnesses, and the immediate deposition of these medical personnel is required to expedite the resolution of this emergency motion currently pending before the Commission on AE 332.

Mr. al Hawsawi has had blood in his urine for over six months now. The only urine cytology report administered to Mr. al Hawsawi, in July 2014, indicates, in part, "CLINICAL CORRELATION IS RECOMMENDED." On this report is a hand-written note, saying "Inconclusive, 0 evidence for cancer but this test did not rule it out." This incomplete documentation begs these questions: what "clinical correlation" should be done? Why hasn't the "clinical correlation" been done? What test would rule cancer out? Why has this test not been performed? What is the treatment plan? These exceptional unaddressed medical conditions, and exceptional unanswered critical questions, create an *exceptional* (indeed, *life or death*) *circumstance,* that warrant deposition under R.M.C. 702. Indeed, it is hard to imagine a more exceptional circumstance.

Per DoD instruction, treatment of detainees should be guided by professional judgments and standards similar to those applied to personnel of the U.S. Armed Forces.[10] Here, how can it be "appropriate medical care" to ignore and leave untreated

---

[10] DODI 2310.08E, Medical Program Support for Detainee Operations, ¶4.1.2.

8

and undiagnosed the ongoing presence of blood in the urine for a six month period? A physician in the United States acting with such deliberate indifference to a serious medical condition would be found liable for medical malpractice.

This is not a matter that permits delay. The recent death of a defendant suffering from liver disease and Hepatitis C who died in custody awaiting trial serves as a cautionary example.[11] Mr. Abu Anas al-Libi suddenly died from his untreated medical conditions on 2 January 2015 in New York.[12] It was reported that Mr. al-Libi suffered from liver disease as a result of Hepatitis C.[13] The Government in that case took a similar position to what the Government has taken in Response to AE 332, that the accused is fine and the Judge should assume the Government is providing appropriate medical care.

The defense acknowledges the fact that while Mr. al-Libi and Mr. al Hawsawi both suffer from liver disease and Hepatitis C, their medical profiles may be different. Nonetheless, if nothing more, Mr. al Libi's death adds to the urgency of the need for these depositions, and ultimate argument on AE 332. Critical care has been withheld from Mr. al Hawsawi, and critical testing has not been conducted. These health care providers know first-hand the full extent of his medical conditions and why critical testing and diagnosis has not been accomplished in his case. The answers to these critical questions need to be immediately brought to light.

---

[11] Sneha Shankar, *Abu Anas al-Libi, Alleged US Embassy Bomber, Dies in New York Before Trial*, Int'l Business Times (January 3, 2015), http://www.ibtimes.com/abu-anas-al-libi-alleged-us-embassy-bomber-dies-new-york-trial-1772630

[12] *Id.*

[13] *Id.*

9

As noted above, defense counsels' repeated attempts to contact Mr. al Hawsawi's health care providers have been ignored or refused by the SJA, making a deposition the only vehicle through which the Defense may question these medical personnel. The need for a deposition is even more pressing due to the Government's efforts to improperly impede defense counsel access to JTF GTMO personnel. The JTF-GTMO SJA's office has provided unclear, inconsistent, and incorrect information to JTF personnel for the rules regarding talking to defense counsel. This has undoubtedly caused a chilling effect among JTF personnel. In *United States v. al-Iraqi*, the Assistant SJA advised the Prosecutor of a JTF policy that JTF personnel could not speak to defense counsel. [14] The SJA's office later did an about face - the Assistant SJA wrote to the Prosecutor, "After looking over the various commissions protective orders, it appears that I was incorrect in stating that the protective orders prohibits defense counsel from speaking to JTF personnel." *See* att. I, E-mail from CPT ███████████ Asst SJA, JTF-GTMO, to LTC David J. Long, OMC OCP, (Oct. 31, 2014, 3:27 PM). The Assistant SJA then wrote, "The only policy that prohibits defense counsel from soliciting information from JTF personnel is SOP #11. Paragraph 11-3(d) reads 'At no time are counsel permitted to solicit information on camp operations or other aspects of JTF-GTMO operations from guards or other JTF personnel. Any attempt by counsel to solicit information will be immediately reported to the JTF-GTMO Office of the Staff Judge Advocate.'" *See* att. J, E-mail from CPT ███████████ Asst SJA, JTF-GTMO, to Maj ██████ ████████ JTF- GTMO/SJA, (Nov. 4, 2014, 3:43 PM); and att. K, JDG SOP #11, Counsel Meetings and Legal Phone Calls with Detainees, 5 August 2014.

---

[14] *US v. al-Iraqi*, Unofficial/Unauthenticated Transcript, November 18, 2014, 1:09pm – 2:55pm, at p. 185.

10

The SJA's office subsequently correctly advised a handful of personnel sought by the defense in the *al-Iraqi* case that they could speak with the defense, but there is no indication that the JTF-GTMO health care personnel were ever so advised. The chilling effect on the health care personnel is obvious and improper, and has undoubtedly prevented Mr. al Hawsawi's medical personnel from speaking with the Defense. This chilling effect is particularly enhanced by the fact that a JTF-GTMO nurse was recently sent to a Board of Inquiry for refusing to follow a JTF order.[15] And it now appears that Mr. al Hawsawi's medical personnel have been issued additional orders, following on the heels of AE 332, which prohibits them from even speaking with Mr. al Hawsawi about his own medical care. These circumstances evince improper Government hindrance with defense counsel access to JTF personnel, for which depositions should be ordered.

7. **Request for Oral Argument**: Oral argument is requested.

8. **Request for Witnesses**: None on this motion for deposition.

9. **Conference with Opposing Counsel**: Prosecution opposes this motion.

10. **Additional Information**: None.

11. **Attachments**:

    A.   Certificate of Service;

    B.   Medical Summary of May 2014*;

    C.   Lab Results from 23 July 2014 – 29 Nov 2014*;

    D.   Urine Cytology report 26 Aug 2014*;

    E.   Results from CT Scans done on 30 July 2014*;

---

[15] Benedict Carey, *Nurses Urge Leniency Over Refusal to Force-Feed at Guantánamo Bay*, The New York Times (Nov. 19, 2014).

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE     JA 48

F.   Memorandum for the Treating Physician of Mustafa al Hawsawi ISN #10011, 19
     Mar 2014;

G.   Memorandum for Treating Physician Mustafa al Hawsawi ISN #10011,
     10 Jul 2014;

H.   Denial to Meet with Medical Provider communicated by the JTF-GTMO
     Litigation Support Staff, 18 Aug 2014;

I.   E-mail from CPT ███████████ Asst SJA, JTF-GTMO, to
     LTC David J. Long, OMC OCP, (Oct. 31, 2014, 3:27 PM);

J.   E-mail from CPT ███████████ Asst SJA, JTF-GTMO, to
     Maj ███████████ JTF-GTMO/SJA, (Nov. 4, 2014, 3:43 PM);

K.   JDG SOP #11, Counsel Meetings and Legal Phone Calls with Detainees,
     5 August 2014.


* These attachments are being filed under seal as medical records and specifically marked "Not
Releasable to Public."


_____//s//_____                           _____//s//_____

SEAN M. GLEASON                               WALTER B. RUIZ
LtCol, USMC                                   Learned Defense Counsel for
Detailed Defense Counsel for                  Mr. al Hawsawi
Mr. al Hawsawi


_____//s//_____

JENNIFER N. WILLIAMS
LTC, JA, USAR
Detailed Defense Counsel for
Mr. al Hawsawi

UNCLASSIFIED//FOR PUBLIC RELEASE    JA 49

# Exhibit H

MILITARY COMMISSIONS TRIAL JUDICIARY
GUANTANAMO BAY, CUBA

| | |
|---|---|
| UNITED STATES OF AMERICA | AE 332C |
| v. | ORDER |
| KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BINALSHIBH, ALI ABDUL AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | DEFENSE MOTION FOR MEDICAL INTERVENTION  10 MARCH 2015 |

1. This ruling applies only in the case of the *United States v Mustafa Ahmend Adam Al Hawsawi*.

2. Mr. al Hawsawi filed a motion requesting the Commission issue an Emergency Order compelling: [a.] the immediate return of Mr. al Hawsawi's medical devices and medications; [b.] immediate and appropriate medical testing to determine the exact source of blood in Mr. al Hawsawi's urine; [c.] release of all medical records to date to counsel and to Mr. al Hawsawi's treating physician(s); [d.] a meeting with Mr. al Hawsawi's physician(s); [e.] an order to medical personnel to provide whatever immediate medical procedures are necessary under established standards of care in order to remedy Mr. al Hawsawi's severe and chronic (long-standing) medical conditions; and [f.] to return Mr. al Hawsawi's legal bins and to immediately cease further interference with his access to legal materials.[1] Mr. Hawsawi supplemented this motion with additional information and argument, again requesting this Commission order items [b] through [e] *supra*.[2]

---

[1] Defense Emergency Motion for Appropriate Medical Intervention and Return of Legal Files, filed 15 December 2014 (AE 332(MAH)).
[2] Mr. Hawsawi's Supplement to AE 332(MAH) Defense Emergency Motion for Appropriate Medical Intervention and Return of Legal Files, filed 2 February 2015 (AE 332(MAH Sup)).

Appellate Exhibit 332C
Page 1 of 2

3. The Government's response provided amplifying information to some of the assertions made in the Defense's motion, as well as detailing the period of time Mr. Hawsawi was unable to access his legal bin.[3]  The Government argued: "Mr. Hawsawi continues to have full access to his legal bins/materials. . . ."[4]  Oral argument was conducted on 12 February 2014.[5]

4. Defense's request for the Commission to compel JTF-GTMO to allow Mr. Hawsawi's access to his legal bin is **MOOT**.

5. Of the remaining items Mr. Hawsawi has requested the Commission to compel, the Defense has not shown they are within the jurisdiction of this Commission.[6]  This Commission has been established to try alien unprivileged enemy belligerents for violations of offenses triable by military commissions. 10 U.S.C. § 948b.  Its jurisdiction is limited to try persons subject to the Military Commissions Act 0f 2009. 10 U.S.C. § 948d.  Thereby, this Commission does not have the authority to address issues concerning medical care.

6. The Defense motion for appropriate medical intervention is **DENIED**.

So ORDERED this 10th day of March, 2015.


//s//
JAMES L. POHL
COL, JA, USA
Military Judge

---

[3] Government Response to Defense Emergency Motion for Appropriate Medical Intervention and Return of Legal Files, filed 29 December 2014 (AE 332B(GOV)).
[4] Id. at 4.
[5] Unofficial/Unauthenticated Transcript of the Khalid Shaikh Mohammad et al. (2) Motions Hearing Dated 12 February 2015 from 9:04 A.M. to 10:31 A.M. at pp. 8386 - 8421.
[6] Government counsel listed numerous other paths for the Defense to attempt to pursue. *See* Unofficial/Unauthenticated Transcript of the Khalid Shaikh Mohammad, et al. (2) Motions Hearing Dated 12 February 2015 from 9:04 A.M. to 10:31 A.M. at pp. 8411.

2

MILITARY COMMISSIONS TRIAL JUDICIARY
GUANTANAMO BAY, CUBA

| UNITED STATES OF AMERICA | AE 340B |
| | ORDER |
| v. | DEFENSE MOTION TO DEPOSE MR. AL HAWSAWI'S HEALTH CARE PROVIDERS |
| KHALID SHAIKH MOHAMMAD, WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH, RAMZI BINALSHIBH, ALI ABDUL AZIZ ALI, MUSTAFA AHMED ADAM AL HAWSAWI | 10 MARCH 2015 |

1. Mr. al Hawsawi filed a motion requesting the deposition of three of Mr. al Hawsawi's health care providers concerning his ongoing medical conditions.[1] Among the reasons for such a deposition, Mr. al Hawsawi stated that due to his declining physical state that "time is of the essence" to develop a record and expeditiously resolve the issues with AE 332(MAH) Defense Emergency Motion for Appropriate Medical Intervention and Return of Legal Files.[2] Defense further illustrates their view of the inadequacy of Mr. al Hawsawi's health care and therefore must depose because "answers to these critical questions need to be immediately brought to light" and their continued requests to interview have been denied.[3]

2. The Government's response asked this Commission to deny because: (1) the depositions are unnecessary because facts already exists in the form of his medical records; (2) the deposition is not sought to preserve testimony for future use at trial; and (3) there is no evidence that his health-care providers will be unavailable at trial.[4]

---

[1] Defense Motion To Depose Mr. al Hawsawi's Health Care Providers, filed 23 January 2015 (AE 340(MAH)).
[2] See Id. at page 2.
[3] See Id. at page 9-10.
[4] Government Response to Defense Motion To Depose Mr. al Hawsawi's Health Care Providers, filed 6 February 2015 (AE 340A(GOV)).

3. Oral argument was conducted on 12 February 2014. [5]

4. This Commission has been established to try alien unprivileged enemy belligerents for violations of offenses triable by military commissions. 10 U.S.C. § 948b. Its jurisdiction is limited to try persons subject to the Military Commissions Act. 10 U.S.C. § 948d. Thereby, this Commission does not have the authority address issues concerning medical care. This Commission denied Mr. al Hawsawi's motion AE 332(MAH), on a similar basis; because Mr. al Hawsawi is attempting to depose his medical providers to enable "adequate" medical care, this request is therefore also outside of this Commission's jurisdiction.

5. The Defense motion for appropriate medical intervention is **DENIED.**

So ORDERED this 10th day of March, 2015.

//s//
JAMES L. POHL
COL, JA, USA
Military Judge

---

[5] Unofficial/Unauthenticated Transcript of the Khalid Shaikh Mohammad, et al. (2) Motions Hearing Dated 12 February 2015 from 9:04 A.M. to 10:31 A.M. at pp. 8386, 8399 – 8401, 8414-8416.

2

UNCLASSIFIED//FOR PUBLIC RELEASE

## CHARGE SHEET

### I. PERSONAL DATA

**1. NAME OF ACCUSED:**

KHALID SHEIKH MOHAMMED
Walid Muhammad Salih Mubarak Bin 'Attash
Ramzi Binalshibh
Ali Abdul Aziz Ali
Mustafa Ahmed Adam al Hawsawi

C6T
9 Apr 12

**2. ALIASES OF ACCUSED:**

Khalid Sheikh Mohammed (aliases Mukhtar al Baluchi; Hafiz; Meer Akram; Abdul Rahman Abdullah Al Ghamdi)
Walid Muhammad Salih Mubarek Bin 'Attash (aliases Khallad; Salah Saeed Mohammed Bin Yousaf; Silver; Tawfiq)
Ramzi Binalshibh (aliases Abu Ubaydah; Ahad Abdollahi Sabet; Abu Ubaydah al Hadrami)
Ali Abdul Aziz Ali (aliases Ammar al Baluchi; Isam Mansur; Isam Mansar; Isam Mansour; Ali; Aliosh; Hani)
Mustafa Ahmed Adam al Hawsawi (aliases Zahir; Hashem Abdollahi; Muhammad Ahanad; Abderahman Mustafa)

C6T
9 Apr 12.

**3. ISN NUMBER OF ACCUSED (LAST FOUR):**

Khalid Sheikh Mohammed (10024)
Walid Muhammad Salih Mubarek Bin 'Attash (10014)
Ramzi Binalshibh (10013)
Ali Abdul Aziz Ali (10018)
Mustafa Ahmed Adam al Hawsawi (10011)

C6T
9 Apr 12

### II. CHARGES AND SPECIFICATIONS

**4. CHARGE:**   VIOLATION OF SECTION AND TITLE OF CRIME IN PART IV OF M.M.C.
**SPECIFICATION:**

See Attached Charges and Specifications.

### III. SWEARING OF CHARGES

| 5a. NAME OF ACCUSER (*LAST, FIRST, MI*) | 5b. GRADE | 5c. ORGANIZATION OF ACCUSER |
|---|---|---|
| Graziano, Anthony | CW3 | Criminal Investigation Task Force (CITF) |

| 5d. SIGNATURE OF ACCUSER | 5e. DATE (YYYYMMDD) |
|---|---|
| | 20110531 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oath in cases of this character, personally appeared the above named accuser the __31st__ day of __May__, __2011__, and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| Darlene S. Simmons | Office of Military Commissions |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |

| CDR, JAGC, USN | Judge Advocate |
|---|---|
| *Grade* | *Official Capacity to Administer Oath* *(See R.M.C. 307(b) must be commissioned officer)* |

DARlen S. Simmon
*Signature*

MC FORM 458 JAN 2007

UNCLASSIFIED//FOR PUBLIC RELEASE   JA 55

## IV. NOTICE TO THE ACCUSED

6. On _____ 31 May _____ , _____ 2011 _____ the accused was notified of the charges against him/her (See R.M.C. 308).

Clayton G. Trivett, Jr, GS-15
*Typed Name and Grade of Person Who Caused*
*Accused to Be Notified of Charges*

Office of Military Commissions
*Organization of the Person Who Caused*
*Accused to Be Notified of Charges*

*Signature*

## V. RECEIPT OF CHARGES BY CONVENING AUTHORITY

7. The sworn charges were received at _1746_ hours, on _1 June 2011_ , at _Alexandria, Virginia_

*Location*

For the Convening Authority: Donna L. Wilkins

*Typed Name of Officer*

GS-15
*Grade*

*Signature*

## VI. REFERRAL

| 8a. DESIGNATION OF CONVENING AUTHORITY | 8b. PLACE | 8c. DATE (YYYYMMDD) |
|---|---|---|
| Convening Authority, 10 U.S.C. § 948h, designated on 25 Mar 10 | Alexandria, VA | 20120404 |

Referred for trial to the ☒(X)capital military commission convened by military commission convening order _12-02_ dated 4 April 2012

subject to the following instructions[1]: _____

See continuation sheet

By _Direction_ of _the Convening Authority, Bruce MacDonald_
*Command, Order, or Direction*

Convening Authority, Chapter 47a
Title 10 U.S.C. § 948h
*Official Capacity of Officer Signing*

Donna L. Wilkins, GS-15
*Typed Name and Grade of Officer*

*Signature*

## VII. SERVICE OF CHARGES

9. On _6 April_ , _2012_ I (caused to be) served a copy these charges on the above named accused.

Clayton G. Trivett, Jr
*Typed Name of Trial Counsel*

GS-15
*Grade of Trial Counsel*

*Signature of Trial Counsel*

## FOOTNOTES

[1]See R.M.C. 601 concerning instructions. If none, so state.

MC FORM 458 JAN 2007

CONTINUATION SHEET – MC FORM 458 JAN 2007, BLOCK VI, REFERRAL
(Original Charge Sheet, Sworn on 20110531)

In the case of United States of America v.

**KHALID SHEIKH MOHAMMED** ((aliases: Mukhtar al Baluchi; Hafiz; Meer Akram; Abdul
Rahman Abdullah Al Ghamdi)

CbT
9 Apr 12

The charges against the above named accused will be tried at a joint trial with the trials of

      Walid Muhammad Salih Mubarak Bin 'Attash;

      Ramzi Binalshibh;

      Ali Abdul Aziz Ali; and

      Mustafa Ahmed Adam al Hawsawi.

These charges will be tried in conjunction with the additional charge sworn on 25 January 2012
and referred on 4 April 2012.

The following charges are referred to trial as capital offenses: Conspiracy, Attacking Civilians,
Murder in Violation of the Law of War, Hijacking an Aircraft, and Terrorism.
This case is referred capital.  See R.M.C. 103(a)(4) and (5).

By Direction of the Convening Authority:

_Donna L. Wilkins_
Donna L. Wilkins, GS-15

Convening Authority, Chapter 47A of
Title 10 U.S.C § 948h

Date: _4 April 2012_

## CHARGE SHEET

### I. PERSONAL DATA

**1. NAME OF ACCUSED:**

Khalid Sheikh Mohammed
WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH
Ramzi Binalshibh
Ali Abdul Aziz Ali
Mustafa Ahmed Adam al Hawsawi

*C6T 9 Apr 12*

**2. ALIASES OF ACCUSED:**

Khalid Sheikh Mohammed (aliases Mukhtar al Baluchi; Hafiz; Meer Akram; Abdul Rahman Abdullah Al Ghamdi)
Walid Muhammad Salih Mubarek Bin 'Attash (aliases Khallad; Salah Saeed Mohammed Bin Yousaf; Silver; Tawfiq)
Ramzi Binalshibh (aliases Abu Ubaydah; Ahad Abdollahi Sabet; Abu Ubaydah al Hadrami)
Ali Abdul Aziz Ali (aliases Ammar al Baluchi; Isam Mansur; Isam Mansar; Isam Mansour; Ali; Aliosh; Hani)
Mustafa Ahmed Adam al Hawsawi (aliases Zahir; Hashem Abdollahi; Muhammad Ahanad; Abderahman Mustafa)

*C6T 9 Apr 12*

**3. ISN NUMBER OF ACCUSED (LAST FOUR):**

Khalid Sheikh Mohammed (10024)
Walid Muhammad Salih Mubarek Bin 'Attash (10014)
Ramzi Binalshibh (10013)
Ali Abdul Aziz Ali (10018)
Mustafa Ahmed Adam al Hawsawi (10011)

*C6T 9 Apr 12*

### II. CHARGES AND SPECIFICATIONS

**4. CHARGE:** VIOLATION OF SECTION AND TITLE OF CRIME IN PART IV OF M.M.C.
**SPECIFICATION:**

See Attached Charges and Specifications.

### III. SWEARING OF CHARGES

| 5a. NAME OF ACCUSER (*LAST, FIRST, MI*) | 5b. GRADE | 5c. ORGANIZATION OF ACCUSER |
|---|---|---|
| Graziano, Anthony | CW3 | Criminal Investigation Task Force (CITF) |

| 5d. SIGNATURE OF ACCUSER | 5e. DATE (YYYYMMDD) |
|---|---|
| | 20110531 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oath in cases of this character, personally appeared the above named accuser the 31st day of May , 2011 , and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| Darlene S. Simmons | Office of Military Commissions |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |
| CDR, JAGC, USN | Judge Advocate |
| *Grade* | *Official Capacity to Administer Oath* (See R.M.C. 307(b) must be commissioned officer) |

*Signature*

MC FORM 458 JAN 2007

## IV. NOTICE TO THE ACCUSED

6. On    31 May    ,    2011    the accused was notified of the charges against him/her (See R.M.C. 308).

Clayton G. Trivett, Jr, GS-15
*Typed Name and Grade of Person Who Caused*
*Accused to Be Notified of Charges*

Office of Military Commissions
*Organization of the Person Who Caused*
*Accused to Be Notified of Charges*

*Signature*

## V. RECEIPT OF CHARGES BY CONVENING AUTHORITY

7. The sworn charges were received at 1746 hours, on 1 June 2011 , at Alexandria, Virginia

*Location*

For the Convening Authority: Donna L. Wilkins

*Typed Name of Officer*

GS-15
*Grade*

*Signature*

## VI. REFERRAL

| 8a. DESIGNATION OF CONVENING AUTHORITY | 8b. PLACE | 8c. DATE (YYYYMMDD) |
|---|---|---|
| Convening Authority, 10 U.S.C. § 948h, designated on 25 Mar 10 | Alexandria, VA | 20120404 |

Referred for trial to the **non**capital military commission convened by military commission convening order 12-02
dated 4 April 2012

_____ subject to the following instructions¹:  _____
See continuation sheet

By Direction of the Convening Authority, Bruce MacDonald
*Command, Order, or Direction*

Donna L. Wilkins, GS-15
*Typed Name and Grade of Officer*

Convening Authority, Chapter 47A
Title 10 U.S.C. §948h
*Official Capacity of Officer Signing*

*Signature*

## VII. SERVICE OF CHARGES

9. On  6 April  ,  2012  I caused to be served a copy these charges on the above named accused.

Clayton G. Trivett, Jr
*Typed Name of Trial Counsel*

GS-15
*Grade of Trial Counsel*

*Signature of Trial Counsel*

## FOOTNOTES

¹See R.M.C. 601 concerning instructions. If none, so state.

MC FORM 458 JAN 2007

CONTINUATION SHEET – MC FORM 458 JAN 2007, BLOCK VI, REFERRAL
(Original Charge Sheet, Sworn on 20110531)

In the case of United States of America v.

**WALID MUHAMMAD SALIH MUBARAK BIN 'ATTASH** (aliases: Khallad; Salah Saeed
Mohammed Bin Yousaf; Silver; Tawfiq)

The charges against the above named accused will be tried at a joint trial with the trials of

Khalid Sheikh Mohammed;

Ramzi Binalshibh;

Ali Abdul Aziz Ali; and

Mustafa Ahmed Adam al Hawsawi

These charges will be tried in conjunction with the additional charge sworn on 25 January 2012
and referred on 4 April 2012.

The following charges are referred to trial as capital offenses: Conspiracy, Attacking Civilians,
Murder in Violation of the Law of War, Hijacking an Aircraft, and Terrorism.
This case is referred capital. See R.M.C. 103(a)(4) and (5).

By Direction of the Convening Authority:

Donna L. Wilkins, GS-15

Convening Authority, Chapter 47A of
Title 10 U.S.C § 948h

Date: 4 April 2012

## CHARGE SHEET

### I. PERSONAL DATA

**1. NAME OF ACCUSED:**

Khalid Sheikh Mohammed
Walid Muhammad Salih Mubarak Bin 'Attash
RAMZI BINALSHIBH
Ali Abdul Aziz Ali
Mustafa Ahmed Adam al Hawsawi

C6T
9 Apr 12

**2. ALIASES OF ACCUSED:**

Khalid Sheikh Mohammed (aliases Mukhtar al Baluchi; Hafiz; Meer Akram; Abdul Rahman Abdullah Al Ghamdi)
Walid Muhammad Salih Mubarek Bin 'Attash (aliases Khallad; Salah Saeed Mohammed Bin Yousaf; Silver; Tawfiq)
Ramzi Binalshibh (aliases Abu Ubaydah; Ahad Abdollahi Sabet; Abu Ubaydah al Hadrami)
Ali Abdul Aziz Ali (aliases Ammar al Baluchi; Isam Mansur; Isam Mansar; Isam Mansour; Ali; Aliosh; Hani)
Mustafa Ahmed Adam al Hawsawi (aliases Zahir; Hashem Abdollahi; Muhammad Ahanad; Abderahman Mustafa)

C6T 12
9 Apr 12

**3. ISN NUMBER OF ACCUSED (LAST FOUR):**

Khalid Sheikh Mohammed (10024)
Walid Muhammad Salih Mubarek Bin 'Attash (10014)
Ramzi Binalshibh (10013)
Ali Abdul Aziz Ali (10018)
Mustafa Ahmed Adam al Hawsawi (10011)

C6T
9 Apr 12

### II. CHARGES AND SPECIFICATIONS

**4. CHARGE:**   VIOLATION OF SECTION AND TITLE OF CRIME IN PART IV OF M.M.C.
**SPECIFICATION:**

See Attached Charges and Specifications.

### III. SWEARING OF CHARGES

| 5a. NAME OF ACCUSER *(LAST, FIRST, MI)* | 5b. GRADE | 5c. ORGANIZATION OF ACCUSER |
|---|---|---|
| Graziano, Anthony | CW3 | Criminal Investigation Task Force (CITF) |

| 5d. SIGNATURE OF ACCUSER | 5e. DATE (YYYYMMDD) |
|---|---|
|  | 20110531 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oath in cases of this character, personally appeared the above named accuser the  31st  day of  May  ,  2011 , and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| Darlene S. Simmons | Office of Military Commissions |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |

| CDR, JAGC, USN | Judge Advocate |
|---|---|
| *Grade* | *Official Capacity to Administer Oath* |
|  | *(See R.M.C. 307(b) must be commissioned officer)* |

Darlene S. Simmons
*Signature*

MC FORM 458 JAN 2007

## IV. NOTICE TO THE ACCUSED

6. On  31 ~~June~~ MAY , ~~2010~~ 2011  the accused was notified of the charges against him/her  (See R.M.C. 308).

| Clayton G. Trivett, Jr, GS-15 | Office of Military Commissions |
|---|---|
| Typed Name and Grade of Person Who Caused Accused to Be Notified of Charges | Organization of the Person Who Caused Accused to Be Notified of Charges |

_Signature_

## V. RECEIPT OF CHARGES BY CONVENING AUTHORITY

7. The sworn charges were received at  1746  hours, on  1 June 2011 , at  Alexandria, Virginia

Location

For the Convening Authority: Donna L. Wilkins

Typed Name of Officer

GS-15

Grade

_Signature_

## VI. REFERRAL

| 8a. DESIGNATION OF CONVENING AUTHORITY | 8b. PLACE | 8c. DATE (YYYYMMDD) |
|---|---|---|
| Convening Authority, 10 U.S.C. § 948h, designated on 25 Mar 10 | Alexandria, VA | 20120404 |

Referred for trial to the (X)(X)capital military commission convened by military commission convening order 12-02

dated 4 April 2012

subject to the following instructions[1]:

See continuation sheet

By Direction  of the Convening Authority, Bruce MacDonald

| Command, Order, or Direction | |
|---|---|
| Donna L. Wilkins, GS-15 | Convening Authority, Chapter 47A Title 10 U.S.C. § 948h |
| Typed Name and Grade of Officer | Official Capacity of Officer Signing |

_Signature_

## VII. SERVICE OF CHARGES

9. On  6 April , 2012  I (caused to be) served a copy these charges on the above named accused.

| Clayton G. Trivett, Jr | GS-15 |
|---|---|
| Typed Name of Trial Counsel | Grade of Trial Counsel |

_Signature of Trial Counsel_

## FOOTNOTES

[1]See R.M.C. 601 concerning instructions.  If none, so state.

**MC FORM 458 JAN 2007**

CONTINUATION SHEET – MC FORM 458 JAN 2007, BLOCK VI, REFERRAL
(Original Charge Sheet, Sworn on 20110531)

In the case of United States of America v.

**RAMZI BINALSHIBH** (aliases: Abu Ubaydah; Ahad Abdollahi Sabet; Abu Ubaydah al
    Hadrami)

The charges against the above named accused will be tried at a joint trial with the trials of

    Khalid Sheikh Mohammed;

    Walid Muhammad Salih Mubarak Bin 'Attash;

    Ali Abdul Aziz Ali; and

    Mustafa Ahmed Adam al Hawsawi

These charges will be tried in conjunction with the additional charge sworn on 25 January 2012
and referred on 4 April 2012.

The following charges are referred to trial as capital offenses: Conspiracy, Attacking Civilians,
Murder in Violation of the Law of War, Hijacking an Aircraft, and Terrorism.
This case is referred capital. <u>See</u> R.M.C. 103(a)(4) and (5).

By Direction of the Convening Authority:

    *Donna L. Wilkins*
    Donna L. Wilkins, GS-15

Convening Authority, Chapter 47A of
Title 10 U.S.C § 948h

Date:   *4 April 2012*

## CHARGE SHEET

### I. PERSONAL DATA

**1. NAME OF ACCUSED:**

Khalid Sheikh Mohammed
Walid Muhammad Salih Mubarak Bin 'Attash
Ramzi Binalshibh
Ali Abdul Aziz Ali
MUSTAFA AHMED ADAM AL HAWSAWI

*CGT 9 Apr 12*

**2. ALIASES OF ACCUSED:**

Khalid Sheikh Mohammed (aliases Mukhtar al Baluchi; Hafiz; Meer Akram; Abdul Rahman Abdullah Al Ghamdi)
Walid Muhammad Salih Mubarek Bin 'Attash (aliases Khallad; Salah Saeed Mohammed Bin Yousaf; Silver; Tawfiq)
Ramzi Binalshibh (aliases Abu Ubaydah; Ahad Abdollahi Sabet; Abu Ubaydah al Hadrami)
Ali Abdul Aziz Ali (aliases Ammar al Baluchi; Isam Mansur; Isam Mansar; Isam Mansour; Ali; Aliosh; Hani)
Mustafa Ahmed Adam al Hawsawi (aliases Zahir; Hashem Abdollahi; Muhammad Ahanad; Abderahman Mustafa)

*CGT 9 Apr 12*

**3. ISN NUMBER OF ACCUSED (LAST FOUR):**

Khalid Sheikh Mohammed (10024)
Walid Muhammad Salih Mubarek Bin 'Attash (10014)
Ramzi Binalshibh (10013)
Ali Abdul Aziz Ali (10018)
Mustafa Ahmed Adam al Hawsawi (10011)

*CGT 9 Apr 12*

### II. CHARGES AND SPECIFICATIONS

**4. CHARGE:** VIOLATION OF SECTION AND TITLE OF CRIME IN PART IV OF M.M.C.
**SPECIFICATION:**

See Attached Charges and Specifications.

### III. SWEARING OF CHARGES

| 5a. NAME OF ACCUSER (*LAST, FIRST, MI*) | 5b. GRADE | 5c. ORGANIZATION OF ACCUSER |
|---|---|---|
| Graziano, Anthony | CW3 | Criminal Investigation Task Force (CITF) |

| 5d. SIGNATURE OF ACCUSER | 5e. DATE (YYYYMMDD) |
|---|---|
| | 20110531 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oath in cases of this character, personally appeared the above named accuser the __31st__ day of __May__, __2011__, and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| Darlene S. Simmons | Office of Military Commissions |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |

| CDR, JAGC, USN | Judge Advocate |
|---|---|
| *Grade* | *Official Capacity to Administer Oath* |
| | *(See R.M.C. 307(b) must be commissioned officer)* |

Darlene S. Simmons
*Signature*

MC FORM 458 JAN 2007

**UNCLASSIFIED//FOR PUBLIC RELEASE**

| IV. NOTICE TO THE ACCUSED |
|---|

6. On _____31 May_____ , _____2011_____ the accused was notified of the charges against him/her (See R.M.C. 308).

Clayton G. Trivett, Jr, GS-15
*Typed Name and Grade of Person Who Caused*
*Accused to Be Notified of Charges*

Office of Military Commissions
*Organization of the Person Who Caused*
*Accused to Be Notified of Charges*

*Signature*

| V. RECEIPT OF CHARGES BY CONVENING AUTHORITY |
|---|

7. The sworn charges were received at _1746_ hours, on _1 June 2011_ , at _Alexandria, Virginia_

*Location*

For the Convening Authority: Donna L. Wilkins
*Typed Name of Officer*

GS-15
*Grade*

*Signature*

| VI. REFERRAL | | |
|---|---|---|
| **8a. DESIGNATION OF CONVENING AUTHORITY** | **8b. PLACE** | **8c. DATE (YYYYMMDD)** |
| Convening Authority, 10 U.S.C. § 948h, designated on 25 Mar 10 | Alexandria, VA | 20120404 |

Referred for trial to the (X) capital military commission convened by military commission convening order _12-02_ dated 4 April 2012

subject to the following instructions[1]:
See continuation sheet

By Direction of the Convening Authority, Bruce MacDonald
*Command, Order, or Direction*

Donna L. Wilkins, GS-15
*Typed Name and Grade of Officer*

Convening Authority, Chapter 47A
Title 10 U.S.C. §948h
*Official Capacity of Officer Signing*

*Signature*

| VII. SERVICE OF CHARGES |
|---|

9. On _6 April_ , _2012_ I (caused to be) served a copy these charges on the above named accused.

Clayton G. Trivett, Jr
*Typed Name of Trial Counsel*

GS-15
*Grade of Trial Counsel*

*Signature of Trial Counsel*

| FOOTNOTES |
|---|

[1]See R.M.C. 601 concerning instructions. If none, so state.

**MC FORM 458 JAN 2007**

**UNCLASSIFIED//FOR PUBLIC RELEASE    JA 65**

UNCLASSIFIED//FOR PUBLIC RELEASE

CONTINUATION SHEET – MC FORM 458 JAN 2007, BLOCK VI, REFERRAL
(Original Charge Sheet, Sworn on 20110531)


In the case of United States of America v.

**ALI ABDUL AZIZ ALI** (aliases: Ammar al Baluchi; Isam Mansur; Isam Mansar; Isam
Mansour; Ali; Aliosh; Hani)


The charges against the above named accused will be tried at a joint trial with the trials of

C 6 T
9 Apr 12

Khalid Sheikh Mohammed;

Walid Muhammad Salih Mubarak Bin 'Attash;

Ramzi Binalshibh; and

Mustafa Ahmed Adam al Hawsawi


These charges will be tried in conjunction with the additional charge sworn on 25 January 2012
and referred on 4 April 2012.


The following charges are referred to trial as capital offenses: Conspiracy, Attacking Civilians,
Murder in Violation of the Law of War, Hijacking an Aircraft, and Terrorism.
This case is referred capital. See R.M.C. 103(a)(4) and (5).


By Direction of the Convening Authority:

Donna L. Wilkins, GS-15

Convening Authority, Chapter 47A of
Title 10 U.S.C § 948h

Date: _4 April 2012_

UNCLASSIFIED//FOR PUBLIC RELEASE     JA 66

UNCLASSIFIED//FOR PUBLIC RELEASE

## CHARGE SHEET

### I. PERSONAL DATA

**1. NAME OF ACCUSED:**

Khalid Sheikh Mohammed
Walid Muhammad Salih Mubarak Bin 'Attash
Ramzi Binalshibh
ALI ABDUL AZIZ ALI
Mustafa Ahmed Adam al Hawsawi

*C 6 T*
*9 Apr 12*

**2. ALIASES OF ACCUSED:**

Khalid Sheikh Mohammed (aliases Mukhtar al Baluchi; Hafiz; Meer Akram; Abdul Rahman Abdullah Al Ghamdi)
Walid Muhammad Salih Mubarek Bin 'Attash (aliases Khallad; Salah Saeed Mohammed Bin Yousaf; Silver; Tawfiq)
Ramzi Binalshibh (aliases Abu Ubaydah; Ahad Abdollahi Sabet; Abu Ubaydah al Hadrami)
Ali Abdul Aziz Ali (aliases Ammar al Baluchi; Isam Mansur; Isam Mansar; Isam Mansour; Ali; Aliosh; Hani)
Mustafa Ahmed Adam al Hawsawi (aliases Zahir; Hashem Abdollahi; Muhammad Ahanad; Abderahman Mustafa)

*C 6 T*
*9 Apr 12*

**3. ISN NUMBER OF ACCUSED (LAST FOUR):**

Khalid Sheikh Mohammed (10024)
Walid Muhammad Salih Mubarek Bin 'Attash (10014)
Ramzi Binalshibh (10013)
Ali Abdul Aziz Ali (10018)
Mustafa Ahmed Adam al Hawsawi (10011)

*C 6 T*
*9 Apr 12*

### II. CHARGES AND SPECIFICATIONS

**4. CHARGE:**   VIOLATION OF SECTION AND TITLE OF CRIME IN PART IV OF M.M.C.
**SPECIFICATION:**

See Attached Charges and Specifications.

### III. SWEARING OF CHARGES

| 5a. NAME OF ACCUSER *(LAST, FIRST, MI)* | 5b. GRADE | 5c. ORGANIZATION OF ACCUSER |
|---|---|---|
| Graziano, Anthony | CW3 | Criminal Investigation Task Force (CITF) |

| 5d. SIGNATURE OF ACCUSER | 5e. DATE (YYYYMMDD) |
|---|---|
| | 20110531 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oath in cases of this character, personally appeared the above named accuser the **31st** day of **May**, **2011**, and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| Darlene S. Simmons | Office of Military Commissions |
|---|---|
| *Typed Name of Officer* | *Organization of Officer* |

| CDR, JAGC, USN | Judge Advocate |
|---|---|
| *Grade* | *Official Capacity to Administer Oath* |
| | *(See R.M.C. 307(b) must be commissioned officer)* |

Darlene S. Simmons
*Signature*

MC FORM 458 JAN 2007

UNCLASSIFIED//FOR PUBLIC RELEASE   JA 67

| IV. NOTICE TO THE ACCUSED | |
|---|---|

6. On 31 ~~June~~ MAY, ~~2010~~ 2011, the accused was notified of the charges against him/her (See R.M.C. 308).

Clayton G. Trivett, Jr, GS-15
*Typed Name and Grade of Person Who Caused*
*Accused to Be Notified of Charges*

Office of Military Commissions
*Organization of the Person Who Caused*
*Accused to Be Notified of Charges*

*Signature*

| V. RECEIPT OF CHARGES BY CONVENING AUTHORITY |
|---|

7. The sworn charges were received at 1746 hours, on 1 June 2011, at Alexandria, Virginia
_____ Location _____

For the Convening Authority: Donna L. Wilkins
*Typed Name of Officer*

GS-15
*Grade*

*Signature*

| VI. REFERRAL | | |
|---|---|---|
| **8a. DESIGNATION OF CONVENING AUTHORITY** Convening Authority, 10 U.S.C. § 948h, designated on 25 Mar 10 | **8b. PLACE** Alexandria, VA | **8c. DATE (YYYYMMDD)** 20120404 |

Referred for trial to the (X)(X)capital military commission convened by military commission convening order 12-02 dated 4 April 2012

subject to the following instructions[1]:
See continuation sheet

By Direction of the Convening Authority, Bruce MacDonald
*Command, Order, or Direction*

Donna L. Wilkins, GS-15
*Typed Name and Grade of Officer*

Convening Authority, Chapter 47A
Title 10 U.S.C. § 948h
*Official Capacity of Officer Signing*

*Signature*

| VII. SERVICE OF CHARGES |
|---|

9. On 6 April, 2012 I (caused to be) served a copy these charges on the above named accused.

Clayton G. Trivett, Jr
*Typed Name of Trial Counsel*

GS-15
*Grade of Trial Counsel*

*Signature of Trial Counsel*

| FOOTNOTES |
|---|

[1]See R.M.C. 601 concerning instructions. If none, so state.

MC FORM 458 JAN 2007

CONTINUATION SHEET – MC FORM 458 JAN 2007, BLOCK VI, REFERRAL
(Original Charge Sheet, Sworn on 20110531)

In the case of United States of America v.

**MUSTAFA AHMED ADAM AL HAWSAWI** (aliases: Zahir; Hashem Abdollahi;
    Muhammad Ahanad; Abderahman Mustafa)

The charges against the above named accused will be tried at a joint trial with the trials of

    Khalid Sheikh Mohammed;

    Walid Muhammad Salih Mubarak Bin 'Attash;

    Ramzi Binalshibh; and

    Ali Abdul Aziz Ali

These charges will be tried in conjunction with the additional charge sworn on 25 January 2012
and referred on 4 April 2012.

The following charges are referred to trial as capital offenses: Conspiracy, Attacking Civilians,
Murder in Violation of the Law of War, Hijacking an Aircraft, and Terrorism.
This case is referred capital. See R.M.C. 103(a)(4) and (5).

By Direction of the Convening Authority:

_Donna L. Wilkins_
Donna L. Wilkins, GS-15

Convening Authority, Chapter 47A of
Title 10 U.S.C § 948h

Date: _4 April 2012_

## CHARGE I: VIOLATION OF 10 U.S.C. §950t (29), CONSPIRACY

**Specification**: In that **Khalid Sheikh Mohammed** (a/k/a Mukhtar al Baluchi; Hafiz; Meer Akram; Abdul Rahman Abdullah Al Ghamdi); **Walid Muhammad Salih Mubarak Bin `Attash** (a/k/a Khallad; Salah Saeed Mohammed Bin Yousaf; Silver; Tawfiq)**; Ramzi Binalshibh** (a/k/a Abu Ubaydah; Ahad Abdollahi Sabet; Abu Ubaydah al Hadrami)**; Ali Abdul Aziz Ali** (a/k/a Ammar al Baluchi; Isam Mansur; Isam Mansar; Isam Mansour; Ali; Aliosh; Hani)**, and Mustafa Ahmed Adam al Hawsawi** (a/k/a/ Zahir; Hashem Abdollahi; Muhammad Ahanad; Abderahman Mustafa), persons subject to trial by military commission as alien unprivileged enemy belligerents, did, at various locations, from in or about 1996, to in or about May 2003, in the context of and associated with hostilities, conspire and agree with Usama bin Laden, Mohammed Atef (a/k/a Abu Hafs al Masri), 19 individuals who hijacked four commercial airliners on September 11, 2001: (American Airlines Flight 11, a Boeing 767 aircraft, tail number N334AA, hereinafter AA #11) Mohamed Atta (a/k/a Abd al-Rahman), Satam al Suqami (a/k/a Azmi), Waleed al Shehri (a/k/a Abu Mis'ab), Wail al Shehri (a/k/a Abu Salman), Abdul Aziz al Omari (a/k/a Abu al-Abbas al-Janubi); (United Airlines Flight 175, a Boeing 767 aircraft, tail number N612UA, hereinafter UA #175) Marwan al Shehhi (a/k/a al-Qa'qa'), Hamza al Ghamdi (a/k/a Julaybib), Ahmed al Ghamdi (a/k/a Ikrimah), Mohand al Shehri (a/k/a Umar al-Azdi), Fayez Rashid Ahmed Hassan Al Qadi Banihammad (hereinafter Fayez Banihammad) (a/k/a Abu Ahmad); (United Airlines Flight 93, a Boeing 757 aircraft, tail number N591UA, hereinafter UA #93) Ziad Samir Jarrah (a/k/a Abu Tariq), Ahmad Ibrahim A. al Haznawi (a/k/a al-Jarrah al-Ghamdi), Ahmed al Nami (a/k/a Abu Hashim), Saeed al Ghamdi (a/k/a Mu'tazz); (American Airlines Flight 77, a Boeing 757 aircraft, tail number N644AA, hereinafter AA #77) Hani Hanjour (a/k/a Urwah al-Ta'ifi), Khalid al Mihdhar (a/k/a Sinan), Nawaf al Hazmi (a/k/a Rabi'ah al-Makki), Majed Moqed (a/k/a al-Ahnaf), Salem al Hazmi (a/k/a Bilal al-Makki); and various other members and associates of the al Qaeda organization, known and unknown, to commit the following offenses triable by military commission, to wit: attacking civilians; attacking civilian objects; intentionally causing serious bodily injury; murder in violation of the law of war; destruction of property in violation of the law of war; hijacking or hazarding a vessel or aircraft; and terrorism. Each of the five accused, knowing the unlawful purpose of the agreement, and with the intent to further the unlawful purpose, willfully joined the conspiracy and did knowingly and intentionally commit at least one of the following overt acts, in order to accomplish some objective or purpose of the agreement, with said conspiracy resulting in the deaths of 2,976 persons (see Charge Sheet Appendix A for a list of victims killed in the attacks):

1.    In August 1996, Usama bin Laden (al Qaeda's "emir" or leader) issued a public "Declaration of Jihad Against the Americans," in which he called for the murder of U.S. military personnel serving on the Arabian Peninsula.

2.    In 1996, **Khalid Sheikh Mohammed** met with Usama bin Laden in Afghanistan and discussed the operational concept of hijacking commercial airliners and crashing them into buildings in the United States and elsewhere. This plan was ultimately approved by Usama bin Laden.



3.    Between 1996 and 2001, **Khalid Sheikh Mohammed**, Usama bin Laden, and Mohammed Atef (a/k/a Abu Hafs al Masri, the military commander of al Qaeda), proposed and discussed potential targets for attack by hijacked commercial airliners and decided to target economic, political, and military buildings in the United States and Western Pacific.

4.    In February 1998, Usama bin Laden, Ayman al Zawahiri, and others, under the banner of "International Islamic Front for Fighting Jews and Crusaders," issued a fatwa (purported religious ruling) requiring all Muslims able to do so to kill Americans – whether civilian or military – anywhere they can be found and to "plunder their money."

5.    On or about May 29, 1998, Usama bin Laden issued a statement entitled "The Nuclear Bomb of Islam," under the banner of the "International Islamic Front for Fighting Jews and Crusaders," in which he stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

6.    In early 1999, Usama bin Laden directed **Walid Muhammad Salih Mubarak Bin `Attash (a/k/a Khallad, hereinafter Khallad Bin `Attash)** to obtain a United States visa so that he could travel to the United States and obtain pilot training in order to participate in what **Khallad Bin `Attash** termed the "Planes Operation."

7.    On or about April 3, 1999, **Khallad Bin `Attash** traveled to San'a, Yemen, and applied for a visa to travel to the United States using the alias "Salah Saeed Mohammed Bin Yousaf." This application was denied.

8.    On or about April 3, 1999, and April 7, 1999, respectively, Nawaf al Hazmi (AA #77) and Khalid al Mihdhar (AA #77) received visas in Jeddah, Saudia Arabia, in order to travel to the United States.

9.    In or about September 1999, **Khallad Bin `Attash** administered a forty-five day special course in hand-to-hand combat training at an al Qaeda camp in Logar, Afghanistan, in order to help select trainees for the "Planes Operation." Nawaf al Hazmi (AA #77) and Khalid al Mihdhar (AA #77) attended this course. After completing the course, al Mihdhar (AA #77) and al Hazmi (AA #77) were selected to be part of the "Planes Operation."

10.    In or about November 1999, **Khallad Bin `Attash** and Nawaf al Hazmi (AA #77) traveled from Qandahar, Afghanistan, to Karachi, Pakistan, where they moved in with **Khalid Sheikh Mohammed**. With the assistance of **Khalid Sheikh Mohammed**, **Khallad Bin `Attash** and Nawaf al Hazmi (AA #77) studied compact discs, books, and other materials to learn about flying airplanes.

11.    While living in Karachi, **Khallad Bin `Attash**, and Nawaf al Hazmi (AA #77) used computer simulators to learn how to fly planes, and studied and researched flight timetables for United States air carriers with **Khalid Sheikh Mohammed**, in order to coordinate the simultaneous hijacking of multiple aircraft.

12. **Khalid Sheikh Mohammed**, who was educated in the United States, taught **Khallad Bin `Attash** and Nawaf al Hazmi (AA #77) various English phrases needed for hijacking airplanes, including "get down," "don't move," "stay in your seat," and "if anyone moves, I'll kill you."

13. In or about 1999, **Khalid Sheikh Mohammed** requested and received funding for his idea of hijacking planes and crashing them into buildings from Usama bin Laden (hereinafter the "Planes Operation").

14. In or about November 1999, **Khalid Sheikh Mohammed** provided Nawaf al Hazmi (AA #77) and Khalid al Mihdhar (AA #77) with funds in order to travel to the United States to train and prepare for the "Planes Operation."

15. In or about December 1999, **Khalid Sheikh Mohammed** directed **Khallad Bin 'Attash** to conduct a casing mission in support of the Planes Operation. **Khalid Sheikh Mohammed** gave **Bin 'Attash** a razor knife to secrete on his person while traveling in order to assess airline security measures. **Khallad Bin `Attash** carried this razor knife on flights to Kuala Lumpur, Malaysia, Bangkok, Thailand, and Hong Kong, China. On these flights, **Khallad Bin `Attash** collected information on United States air carriers, such as the number of passengers on the flights that were in first class, business class, and economy class.

16. In or about December 1999, **Khallad Bin `Attash** devised a scheme in order to assist Nawaf al Hazmi (AA #77) in traveling to the United States. In order to hide al Hazmi's previous travel to Pakistan, **Khallad Bin `Attash** directed al Hazmi to purchase two different tickets for travel to Malaysia, one using a fraudulently-issued Yemeni passport, which masked his travel to Pakistan and Afghanistan on Hazmi's valid Saudi passport.

17. On or about December 30, 1999, **Khallad Bin `Attash** (using the alias Salah Saeed Mohammed BinYousaf), traveled from Kuala Lumpur, Malaysia, to Bangkok, Thailand, via Malaysia Airlines Flight #782 and stayed at the JW Marriott, a five star hotel in Bangkok.

18. On or about December 31, 1999, **Khallad Bin `Attash** (using the alias Salah Saeed Mohammed Yusuf) traveled as a first-class passenger from Bangkok, Thailand, to Hong Kong, China, via United Airlines Flight #2 to conduct surveillance on airline security and collect information regarding air carriers for flights in Southeast Asia.

19. On or about January 1, 2000, **Khallad Bin `Attash** (using the alias Salah Saeed Mohammed Yusuf), traveled as a first-class passenger from Hong Kong, China, to Bangkok, Thailand, via United Airlines Flight #1 to conduct surveillance on airline security and collect information regarding air carriers for flights in Southeast Asia.

20. On or about January 2, 2000, **Khallad Bin `Attash** (using the alias Salah Saeed Mohammed BinYousaf), traveled from Bangkok, Thailand, to Kuala Lumpur, Malaysia,

UNCLASSIFIED//FOR PUBLIC RELEASE

via Thai Airways Flight #415 in order to facilitate onward travel for Nawaf al Hazmi (AA #77) and Khalid al Mihdhar (AA #77) from Kuala Lumpur to the United States.

21.    On or about January 5, 2000, Khalid al Mihdhar (AA # 77) traveled to Kuala Lumpur, Malaysia, via Malaysian Airlines Flight #91.

22.    Between, on, or about January 5, 2000 and on or about January 8, 2000, while in Malaysia, on various occasions, **Khallad Bin `Attash** briefed Nawaf al Hazmi (AA #77) and Khalid al Mihdhar (AA #77) regarding **Khallad Bin `Attash's** surveillance during casing flights, to include the security on the flights, secreting the razor knife onboard the aircraft, and other flight information for use in the "Planes Operation."

23.    On or about January 8, 2000, Nawaf al Hazmi (AA #77), Khalid al Mihdhar (AA # 77), and **Khallad Bin `Attash** (using the alias Salah Saeed Mohammed) flew together, seated in the same row, from Kuala Lumpur, Malaysia, to Bangkok, Thailand, on Malaysia Airlines Flight #782.

24.    On or about January 15, 2000, Nawaf al Hazmi (AA #77) and Khalid al Mihdhar (AA #77), the first two hijackers to reach the United States, traveled from Bangkok, Thailand, to Los Angeles, California, on United Airlines Flight # 2, with orders from **Khalid Sheikh Mohammed** to undergo flight training, learn English, and affiliate with a mosque to help them assimilate in the United States.

25.    On or about January 20, 2000, **Khallad Bin `Attash** (using the alias Salah Saeed Mohammed BinYousaf), traveled from Bangkok, Thailand, to Karachi, Pakistan, via Thai Airways Flight #507.

26.    Upon his return to Karachi, Pakistan, **Khallad Bin `Attash** prepared a written report and briefed **Khalid Sheikh Mohammed** and Mohammed Atef (a/k/a Abu Hafs al Masri, the military commander of al Qaeda) on airline security and **Khallad Bin `Attash's** ability to get the razor knife on board the flights.

27.    Between November 1999 and February 2000, **Ramzi Binalshibh**, Mohamed Atta (AA #11), Marwan al Shehhi (UA #175), and Ziad Jarrah (UA #93) traveled from Hamburg, Germany, to Qandahar, Afghanistan to attend an al Qaeda training camp.

28.    In or about January 2000, Usama bin Laden chose **Ramzi Binalshibh**, Mohamed Atta (AA #11), Marwan al Shehhi (UA #175), and Ziad Jarrah (UA #93) to participate in the "Planes Operation" in the United States.

29.    In or about January 2000, Usama bin Laden and Mohammed Atef (a/k/a Abu Hafs al Masri, the military commander of al Qaeda) tasked **Ramzi Binalshibh**, Mohamed Atta (AA #11), Marwan al Shehhi (UA #175), and Ziad Jarrah (UA #93) to obtain flight training for a martyrdom operation and report to **Khalid Sheikh Mohammed** on their progress.

UNCLASSIFIED//FOR PUBLIC RELEASE    JA 73

30. In or about January 2000, **Ramzi Binalshibh**, Mohamed Atta (AA #11), and Ziad Jarrah (UA #93) filmed videos to serve as their "martyr wills" in anticipation of dying in an attack against the United States.

31. In or about January 2000, Mohammed Atef (a/k/a Abu Hafs al Masri, the military commander of al Qaeda) sent **Ramzi Binalshibh** and Mohamed Atta (AA #11) to Karachi, Pakistan, to meet with **Khalid Sheikh Mohammed** for the first time to discuss future communication protocols between **Khalid Sheikh Mohammed** and the hijackers.

CGT 9 Apr 12

32. As part of the operational security for the "Planes Operation," **Khalid Sheikh Mohammed** instructed both Mohamed Atta (AA #11) and Nawaf al Hazmi (AA #77) to meet in places in the United States where tourists frequent so they would not stand out.

CGT 9 Apr 12

33. In or about January 2000, **Khalid Sheikh Mohammed** told **Ali Abdul Aziz Ali** that "Marwan" (identified by **Ali** as Marwan al Shehhi (UA #175)) would be traveling to meet **Ali** in Dubai, United Arab Emirates. **Khalid Sheikh Mohammed** directed **Ali** and al Shehhi (UA#175) to use the internet to order a video entitled "CityBird," depicting cockpit operations in a Boeing 767-300 while flying throughout the world.

CGT 9 Apr 12

34. On or about January 3, 2000, Marwan al Shehhi (UA #175) and **Ali Abdul Aziz Ali** ordered the "CityBird" video online and had it shipped to **Ali** at Post Office Box (P.O. Box) 16958, Dubai, United Arab Emirates. After receiving the video, **Ali** delivered the video to **Khalid Sheikh Mohammed** in Pakistan.

CGT 9 Apr 12

35. On or about January 3, 2000, Marwan Al-Shehhi (UA #175) and **Ali Abdul Aziz Ali** also purchased Boeing 747 flight simulator computer software.

36. In or about March 2000, upon returning to Hamburg, Germany, **Ramzi Binalshibh** and Mohamed Atta (AA #11) researched flight schools via the internet in support of the "Planes Operation."

37. On or about March 22, 2000, Mohamed Atta (AA #11) sent an email from Germany to several flight schools in the United States stating, "we are a small group (2-3) of joung [sic] men from different arab countries… We would like to start training for the career of airline professional pilots."

38. On or about March 26, 2000, Ziad Jarrah (UA #93) submitted an application to the Florida Flight Training Center (FFTC) in Venice, Florida, and later enrolled.

39. In or about April 2000, **Khalid Sheikh Mohammed** provided **Ali Abdul Aziz Ali** with over $100,000 to be utilized for "operational purposes."

CGT 9 Apr 12

40. In or about April 2000, at the direction of **Khalid Sheikh Mohammed**, **Ali Abdul Aziz Ali** spoke over the telephone with Nawaf al Hazmi (AA #77) (who was in the United States), who requested **Ali Abdul Aziz Ali** send funds.

CGT 9 Apr 12

41.   On or about April 16, 2000, **Ali Abdul Aziz Ali** transferred approximately $5,000 to Nawaf al Hazmi (AA #77), through a third party, in San Diego, California.

42.   On or about May 17, 2000, in Berlin, Germany, **Ramzi Binalshibh** applied for a visa to travel to the United States, which was denied.

43.   On or about May 18, 2000, in Berlin, Germany, Mohamed Atta (AA #11) received a visa to travel to the United States.

44.   On or about May 25, 2000, in Berlin, Germany, Ziad Jarrah (UA #93) received a visa to travel to the United States.

45.   On or about May 29, 2000, Marwan al Shehhi (UA #175) traveled from Brussels, Belgium, to Newark, New Jersey.

46.   On or about June 3, 2000, Mohamed Atta (AA #11) traveled from Prague, Czech Republic, to Newark, New Jersey.

47.   On or about June 13, 2000, **Ramzi Binalshibh** sent a Moneygram wire transfer from Hamburg, Germany, in the amount of 5,789.26 German Deutschmarks (U.S. $2,708.33) to Marwan al Shehhi (UA #175) in New York, New York.

48.   On or about June 15, 2000, in Berlin, Germany, **Ramzi Binalshibh** applied for the second time for a visa to travel to the United States, which was denied.

49.   On or about June 21, 2000, **Ramzi Binalshibh** sent a Moneygram wire transfer from Hamburg, Germany, in the amount of 3,862.76 German Deutschmarks (U.S. $1,803.19) to Marwan al Shehhi (UA #175) in New York, New York.

50.   On or about June 27, 2000, Ziad Jarrah (UA #93) traveled from Munich, Germany, to Atlanta, Georgia.

51.   On or about June 29, 2000, **Ali Abdul Aziz Ali** (using the alias "Isam Mansar") transferred approximately $5,000 from Dubai, United Arab Emirates, to Marwan al Shehhi (UA #175) in New York, New York.

52.   On or about July 7, 2000, Mohamed Atta (AA #11) and Marwan al Shehhi (UA #175) opened a joint checking account at SunTrust Bank in Venice, Florida, with a $7,000 cash deposit.

53.   On or about July 18, 2000, **Ali Abdul Aziz Ali** (using the alias "Isam Mansur") transferred approximately $10,000 from Dubai, United Arab Emirates, to the joint SunTrust Bank account of Mohamed Atta (AA #11) and Marwan al Shehhi (UA #175) in Venice, Florida.

54. Between, in, or about July 2000 and in or about December 2000, Mohamed Atta (AA #11) and Marwan al Shehhi (UA #175) attended flight training classes at Huffman Aviation in Venice, Florida.

55. On or about July 26, 2000, in Germany, **Ramzi Binalshibh** wired 3,853 German Deutschmarks (U.S. $1,760.61) from Hamburg, Germany, to Marwan al Shehhi (UA #175) in Sarasota, Florida.

56. On or about August 5, 2000, **Ali Abdul Aziz Ali** (using the alias "Isam Mansour") transferred approximately $9,500 from Dubai, United Arab Emirates, to the joint SunTrust Bank account of Mohamed Atta (AA #11) and Marwan al Shehhi (UA #175) in Venice, Florida.

57. In or about August 2000, Ziad Jarrah (UA #93), while attending flight training at Florida Flight Training Center, assisted **Ramzi Binalshibh** in his attempt to enroll in flight training with him.

58. On or about August 14, 2000, **Ramzi Binalshibh** wired 4,739.32 German Deutschmarks (approximately U.S. $2,200) from his account in Germany to the Florida Flight Training Center, in Venice, Florida.

59. On or about August 29, 2000, **Ali Abdul Aziz Ali** (using the name "Mr. Ali") transferred approximately $20,000 from Dubai, United Arab Emirates, to the joint SunTrust Bank account of Mohamed Atta (AA #11) and Marwan al Shehhi (UA #175) in Venice, Florida.

60. Beginning in September 2000, **Ramzi Binalshibh** attempted to enroll in the Aviation Language School in Miami, Florida.

61. On or about September 15, 2000, in San'a, Yemen, **Ramzi Binalshibh** applied for the third time for a visa to travel to the United States, which was denied.

62. On or about September 17, 2000, **Ali Abdul Aziz Ali** (using the alias "Hani (Fawaz TRDNG)") transferred approximately $70,000 from Dubai, United Arab Emirates, to the joint SunTrust Bank account of Mohamed Atta (AA #11) and Marwan al Shehhi (UA #175) in Venice, Florida.

63. On or about September 25, 2000, **Ramzi Binalshibh** wired $4,118.13 from Hamburg, Germany, to Marwan al Shehhi (UA #175) in Nokomis, Florida, via Western Union.

64. On or about October 25, 2000, in Berlin, Germany, **Ramzi Binalshibh** applied for the fourth and final time for a visa to travel to the United States, which was denied.

65. When **Ramzi Binalshibh** was unable to obtain a visa to travel to the United States, **Khalid Sheikh Mohammed** named **Binalshibh** as his main assistant in the "Planes

C6T
9 Apr 12

UNCLASSIFIED//FOR PUBLIC RELEASE

Operation" due to his knowledge of the details of the plot. **Khalid Sheikh Mohammed** selected Mohamed Atta (AA #11) as the "emir," or leader, of the group and Nawaf al Hazmi (AA #77) as Atta's "deputy." **Khalid Sheikh Mohammed** gave Mohamed Atta (AA #11) full authority to make operational decisions in the United States.



C6T
9 Apr 12

C6T
9 Apr 12

66.   On or about November 5, 2000, Mohamed Atta (AA #11) ordered flight deck videos for the Boeing 747 Model 200 and the Boeing 757 Model 200, as well as other items from Sporty's Pilot Shop in Batavia, Ohio.

67.   In or about December 2000, **Khallad Bin `Attash** provided Hani Hanjour (AA #77) with an email address in order to contact Nawaf al Hazmi (AA #77) in the United States.

68.   On December 2, 2000, Hani Hanjour (AA #77) traveled to Dubai, United Arab Emirates.

69.   On or about December 5, 2000, **Ali Abdul Aziz Ali** helped Hani Hanjour (AA #77) open a banking account at the Deira, Dubai, United Arab Emirates, Citibank (hereinafter Hanjour Citibank account), and provided approximately $3,000 to Hani Hanjour to deposit in the account.

70.   In or about December 2000, **Ali Abdul Aziz Ali** reserved a plane ticket for Hani Hanjour (AA #77) to travel to the United States to join the other operatives already there.

71.   On or about December 8, 2000, Hani Hanjour (AA #77) traveled from Dubai, United Arab Emirates, to San Diego, California.

72.   Upon Hani Hanjour's (AA #77) arrival in San Diego, Nawaf al Hazmi (AA #77) contacted **Ali Abdul Aziz Ali** to advise him that Hanjour had arrived safely.

73.   On or about December 11, 2000, Mohamed Atta (AA #11) ordered flight deck videos for the Boeing 767 Model 300ER and the Airbus A320-200 from Sporty's Pilot Shop in Batavia, Ohio.

74.   On or about December 26, 2000, **Ali Abdul Aziz Ali** traveled from Dubai, United Arab Emirates, to Karachi, Pakistan, and returned to Dubai on or about January 5, 2001.

75.   On or about January 28, 2001, in Dubai, United Arab Emirates, **Ali Abdul Aziz Ali** deposited $5,000 in Hani Hanjour's (AA #77) Citibank account.

76.   In or about late January 2001, **Ramzi Binalshibh** traveled from Germany to Afghanistan to notify Usama bin Laden, Mohammed Atef (a/k/a Abu Hafs al Masri, the military commander of al Qaeda), and **Khalid Sheikh Mohammed** that Mohamed Atta (AA #11), Marwan al Shehhi (UA #175), and Ziad Jarrah (UA #93) had completed their initial flight training in the United States.

C6T
9 Apr 12

UNCLASSIFIED//FOR PUBLIC RELEASE   JA 77

77. In or about March 2001, having already earned his pilot's license in 1999, Hani Hanjour (AA #77) attended flight simulator training in Phoenix, Arizona, at Pan Am International Flight Academy, Jet Tech International.

78. On or about January 30, 2001, Hani Hanjour (AA #77) paid the balance of his simulator training with a Bank of America cashier's check in the amount of $5,745.00.

79. Between on or about January 31, 2001, and on or about February 6, 2001, Mohamed Atta (AA #11) and Marwan al Shehhi (UA #175) took flight "check rides" around Decatur, Georgia.

80. On or about March 19, 2001, Nawaf al Hazmi (AA #77) ordered flight deck videos for the Boeing 747 Model 400, the Boeing 747 Model 200, and the Boeing 777 Model 200, and another video from Sporty's Pilot Shop in Batavia, Ohio.

81. In or about April 2001, **Mustafa al Hawsawi** traveled to Dubai, United Arab Emirates, from Karachi, Pakistan, at the direction of al Qaeda's Media Committee.

82. Between in or about September 2000 and in or about July 2001, **Khalid Sheikh Mohammed** instructed the non-pilot hijackers to travel to their home countries to obtain "clean" passports (a passport not reflecting travel to Pakistan or Afghanistan), visas from other Western countries, and visas to the United States, then return to Pakistan. Following the hijackers' return to Pakistan, **Khalid Sheikh Mohammed** sent them to Dubai, United Arab Emirates, to await final travel to the United States. On several occasions, **Khalid Sheikh Mohammed** provided the non-pilot hijackers with chemicals in an eye dropper to remove any Pakistani stamps from their passports.

83. **Khalid Sheikh Mohammed** personally trained the hijackers and informed them that they were going on a martyrdom operation involving airplanes, but at the time of their training they were not made aware of the specific targets.

84. **Khalid Sheikh Mohammed** and others trained the non-pilot hijackers by providing instructions on how to pack their bags to best secrete knives onto a plane, and on how to slit passengers' throats by making the hijackers practice on sheep, goats, and camels in preparation for the "Planes Operation."

85. **Khalid Sheikh Mohammed** directed al Qaeda members to film martyr videos of some of the hijackers, several of which were later released publicly through al Qaeda's media wing, As Sahab Productions.

86. Beginning on or about April 19, 2001, **Khalid Sheikh Mohammed** ordered that the non-pilot hijackers be sent to the United States and gave the hijackers operational guidance on how to avoid detection during their travel to the United States.

87. On or about April 23, 2001, Satam al Suqami (AA #11) and Waleed al Shehri (AA #11) traveled from Dubai, United Arab Emirates, via Emirates Flight #7 to London-Gatwick, England, and Virgin Atlantic Flight #27 from London to Orlando, Florida.

88. On or about May 1, 2001, Satam al Suqami (AA #11) and Waleed al Shehri (AA #11) opened a joint bank account at SunTrust Bank in Florida with a cash deposit of $9,000.

89. On or about May 2, 2001, Ahmad al Ghamdi (UA #175) and Majed Moqed (AA# 77) traveled from Dubai, United Arab Emirates, via Emirates Flight #1 to London-Heathrow, England, and United Airlines Flight #925 from London to Washington-Dulles, Virginia.

90. Beginning in or about May 2001, while in Florida, Ziad Jarrah (UA #93) joined a gym and took martial arts lessons which included instruction in knife fighting.

91. On or about May 26, 2001, Mohand al Shehri (UA #93), Ahmed al Nami (UA #93), and Hamza al Ghamdi (UA #175) purchased plane tickets to travel from Dubai, United Arab Emirates, to Miami, Florida, via London, England. They all listed 050 7696327 as their contact number, a phone number associated with **Ali Abdul Aziz Ali.**

92. On or about May 28, 2001, Mohand al Shehri (UA #93), Ahmed al Nami (UA #93), and Hamza al Ghamdi (UA #175) traveled from Dubai, United Arab Emirates, via Emirates Flight #7 to London-Gatwick, England, and Virginia Atlantic Flight #5 from London to Miami, Florida.

93. On or about June 1, 2001, Mohand al Shehri (UA #93), Ahmed al Nami (UA #93), and Hamza al Ghamdi (UA #175) opened bank accounts at SunTrust Bank in Florida with cash deposits of $4,700, $4,800, and $3,000, respectively.

94. On or about June 6, 2001, Ahmad al Haznawi (UA #93) and Wail al Shehri (AA #11) purchased plane tickets to travel from Dubai, United Arab Emirates, to Miami, Florida via London, England. They both listed 050 7696327 as their contact number, a phone number associated with **Ali Abdul Aziz Ali**.

95. On or about June 8, 2001, Ahmed al Haznawi (UA #93) and Wail al Shehri (AA #11) traveled from Dubai, United Arab Emirates via Emirates Flight #7 to London-Gatwick, England, and Virgin Atlantic Flight #5 from London to Miami, Florida.

96. On or about June 18, 2001, Wail al Shehri (AA #11) opened a bank account at SunTrust Bank in Florida with a deposit of $8,000.

97. On or about June 23, 2001, **Mustafa al Hawsawi** opened a bank account at the Standard Chartered Bank in Sharjah, United Arab Emirates, and obtained an ATM card in connection with the checking account.

98. On or about June 24, 2001, **Mustafa al Hawsawi** opened P.O. Box 19738 in Sharjah, United Arab Emirates.

99. On or about June 25, 2001, Fayez Banihammad (UA #175), accompanied by **Mustafa al Hawsawi**, opened a current account, fixed deposit account, and VISA card account at the same Standard Chartered Bank branch used by **al Hawsawi** two days earlier. Fayez Banihammad (UA #175) provided **al Hawsawi** with a power of attorney letter to grant him the authority to pick up Banihammad's ATM and credit card.

100. On or about June 25, 2001, **Mustafa al Hawsawi** opened a fixed deposit account and applied for a VISA card at the Standard Chartered Bank in Sharjah, United Arab Emirates.

101. On or about June 25, 2001, **Mustafa al Hawsawi** purchased plane tickets for Fayez Banihammad (UA #175) and Saeed al Ghamdi (UA #93) to travel from Dubai, United Arab Emirates, to Orlando, Florida, via London, England. They both listed 050 5209905 as their contact number, a phone number associated with **Mustafa al Hawsawi**.

102. On or about June 27, 2001, Fayez Banihammad (UA #175) and Saeed al Ghamdi (UA #93) traveled from Dubai, United Arab Emirates, on Emirates Flight #7 via London-Gatwick, England, and Virgin Atlantic Flight #15 from London to Orlando, Florida.

103. While the non-pilot hijackers were in Dubai, **Ali Abdul Aziz Ali** and **Mustafa al Hawsawi** assisted them by purchasing clothing, food, lodging, rental cars, traveler's checks, and making travel arrangements.

104. Each hijacker was given between $6,000 and $10,000 in cash by **Khalid Sheikh Mohammed** or **Mustafa al Hawsawi** with instructions to keep a few thousand dollars for themselves and to give the remaining money to Mohamed Atta (AA #11) for operational expenses.

*C6T 9 Apr 12*

105. On or about June 26, 2001, **Ali Abdul Aziz Ali** traveled from Dubai, United Arab Emirates, to Karachi, Pakistan. Between, on, or about June 27, 2001, and on or about July 14, 2001, **Ali Abdul Aziz Ali** met with **Khalid Sheikh Mohammed** and advised **Mohammed** that **Ali** was willing to do anything to help the mission (referring to the "Planes Operation") which, based on past conversations between **Ali** and **Mohammed**, included being a martyr. **Mohammed** directed **Ali Abdul Aziz Ali** to apply for a United States visa to travel to the United States.

*C6T 9 Apr 12*
*C6T 9 Apr 12*
*C6T 9 Apr 12*

106. On or about June 28, 2001, Abdul Aziz al Omari (AA #11) and Salem al Hazmi (AA #77) purchased plane tickets to travel from Dubai, United Arab Emirates, to New York, New York, via Zurich, Switzerland. They both listed 050 5209905 as their contact number, a phone number associated with **Mustafa al Hawsawi**.

107. On or about June 29, 2001, Salem al Hazmi (AA #77) and Abdul Aziz al Omari (AA #11) traveled from Dubai, United Arab Emirates, to New York, New York, via Zurich, Switzerland.

108. On or about July 4, 2001, Khalid al Mihdhar (AA #77) traveled to New York, New York, from Riyadh, Saudi Arabia.

109. On or about July 8, 2001, Mohamed Atta (AA #11) purchased two Victorinox Swiss Army pocket knives in Zurich, Switzerland.

110. On or about July 9, 2001, Nawaf al Hazmi (AA #77), Majed Moqed (AA #77) and Ahmed al Ghamdi (UA #175) opened bank accounts at the Dime Savings Bank in New Jersey.

111. On or about July 12, 2001, Ahmad al Haznawi (UA #93) opened a bank account at SunTrust Bank in Florida with a $500 deposit.

112. On or about July 12, 2001, Saeed al Ghamdi (UA #93) opened a bank account at SunTrust Bank in Florida with a $4,500 deposit.

113. On or about July 18, 2001, Fayez Banihammad (UA #175) opened an account at SunTrust Bank in Florida with a $1,000 deposit.

114. On or about July 18, 2001, Khalid al Mihdhar (AA #77) opened a bank account at Hudson United Bank in New Jersey with a $300 deposit.

115. On or about July 18, 2001, **Mustafa al Hawsawi** took power of attorney over Fayez Banihammad's (UA #175) Standard Chartered Bank accounts in the United Arab Emirates.

116. On or about July 18, 2001, using his power of attorney, **Mustafa al Hawsawi** picked up Fayez Banihammad's (UA #175) VISA and ATM cards from Standard Chartered Bank in the United Arab Emirates.

117. On or about July 23, 2001, **Mustafa al Hawsawi** withdrew 500 Dirhams (U.S. $136.24) from an ATM in Sharjah, United Arab Emirates, from the Standard Chartered Bank account of Fayez Banihammad (UA #175).

118. On or about July 23, 2001, **Mustafa al Hawsawi** sent a package using the alias "Hashim" to Fayez Banihammad (UA #175) in Delray Beach, Florida, listing the mobile phone number 5209905 and P.O. Box 19738, SHJ, UAE.

119. On or about August 1, 2001, in Florida, Fayez Banihammad's (UA #175) Standard Chartered Bank VISA card was used for the first time in the United States to withdraw approximately $2,804.50.

UNCLASSIFIED//FOR PUBLIC RELEASE

Case 1:15-cv-01257-RJL Document 10-1 Filed 08/21/15 Page 20 of 124
USCA Case #15-5267 Document #1585851 Filed: 11/16/2015 Page 84 of 91

120. On or about July 21, 2001, Salem al Hazmi (AA #77) opened a bank account at Hudson United Bank in New Jersey with a $500 deposit.

121. On or about July 26, 2001, Abdul Aziz al Omari (AA #11) opened a bank account at Hudson United Bank in New Jersey with a $100 deposit.

122. On August 13, 2001, Marwan al Shehhi (UA #175) purchased two knives from Sports Authority, Boynton Beach, Florida.

123. On August 13, 2001, Fayez Banihammad (UA #175) purchased a Stanley two-piece knife snap set from Wal-Mart, Boynton Beach, Florida.

124. On or about August 17, 2001, Ziad Jarrah (UA #93) took a "check ride" at a flight school in Fort Lauderdale, Florida.

125. On or about August 22, 2001, Fayez Banihammad (UA #175) used his VISA card in Florida to obtain approximately $4,800 cash, which was previously deposited into his Standard Chartered Bank account in the United Arab Emirates.

126. On or about late August 2001, **Ramzi Binalshibh** sent a message to **Khalid Sheikh Mohammed** notifying him that Mohamed Atta (AA #11) had chosen September 11, 2001, as the date of the operation. **Khalid Sheikh Mohammad** reported the date to Usama bin Laden, who began preparing al Qaeda members and their families in Afghanistan in anticipation of the expected United States military response. **Khalid Sheikh Mohammad** traveled from Afghanistan to Pakistan shortly after having been notified.

CbT
9 Apr 12

127. On or about August 25, 2001, **Mustafa al Hawsawi** applied for a supplemental Standard Chartered Bank VISA card in the name of Abdul Rahman Abdullah al Ghamdi, and attached a photograph of **Khalid Sheikh Mohammed** as the supplemental applicant.

CbT
9 Apr 12

CbT
9 Apr 12

128. On or about August 25, 2001, Khalid al Mihdhar (AA #77) and Majed Moqed (AA #77) reserved tickets for American Airlines Flight 77, scheduled to depart Washington Dulles International Airport, Dulles, Virginia, at 8:10 a.m. and arrive at Los Angeles, California, on September 11, 2001.

129. On or about August 26, 2001, tickets were reserved for Waleed al Shehri (AA #11) and Wail al Shehri (AA #11) on American Airlines Flight 11, scheduled to depart Logan International Airport, Boston, Massachusetts, at 7:45 a.m. and arrive at Los Angeles, California, on September 11, 2001.

130. On or about August 27, 2001, tickets were reserved for Fayez Banihammad (UA #175) and Mohand al Shehri (UA #175) on United Airlines Flight 175, scheduled to depart Logan International Airport, Boston, Massachusetts, at 8:00 a.m. and arrive at Los Angeles, California, on September 11, 2001.

131.  On or about August 27, 2001, tickets were reserved for Nawaf al Hazmi (AA #77) and Salem al Hazmi (AA #77) on American Airlines Flight 77 for travel on September 11, 2001.

132.  On or about August 27, 2001, tickets were reserved for Saeed al Ghamdi (UA #93) and Ahmed al Nami (UA #93) on United Airlines Flight 93, scheduled to depart from Newark International Airport, Newark, New Jersey, at 8:00 a.m. and arrive at San Francisco, California, on September 11, 2001.

133.  On or about August 27, 2001, Nawaf al Hazmi (AA #77) purchased a Leatherman Wave Multi-tool from Target, in Laurel, Maryland.

134.  On or about August 22, 2001, and August 27, 2001, in Miami, Florida, Ziad Jarrah (UA #93) purchased a Global Positioning System ("GPS") device, other GPS-related equipment, and schematics for Boeing 757 cockpit instrument diagrams.

135.  On or about August 28, 2001, tickets were reserved for Mohamed Atta (AA #11), Abdul Aziz al Omari (AA #11), and Satam al Suqami (AA#11) on American Airlines Flight 11 for travel on September 11, 2001.

136.  On or about August 28, 2001, tickets were reserved for Marwan al Shehhi (UA #175) on United Airlines Flight 175 for travel on September 11, 2001.

137.  On or about August 28, 2001, in Dubai, United Arab Emirates, **Ali Abdul Aziz Ali** applied for a visa to travel to the United States on September 4, 2001, for a period of one week.  This application was denied.

138.  On or about August 29, 2001, tickets were reserved for Ahmed al Ghamdi (UA #175) and Hamza al Ghamdi (UA #175) on United Airlines Flight 175 for travel on September 11, 2001.

139.  On or about August 29, 2001, tickets were reserved for Ahmed al Haznawi (UA #93) on United Airlines Flight 93 for travel on September 11, 2001.

140.  On or about August 30, 2001, tickets were reserved for Ziad Jarrah (UA #93) on United Airlines Flight 93 for travel on September 11, 2001.

141.  On or about August 30, 2001, Hamza al Ghamdi (UA #175) purchased a Leatherman Wave Multi-Tool from Lowe's Home Improvement, Boynton Beach, Florida.

142.   On or about August 31, 2001, tickets were reserved for Hani Hanjour (AA #77) on American Airlines Flight 77 for travel on September 11, 2001.

143.  On or about September 3, 2001, **Mustafa al Hawsawi**, using the alias Hashem Abdollahi, and listing the contact phone number 050 7692590, sent $1,500 to Ahad Abdollahi Sabet, an alias for **Ramzi Binalshibh**.

UNCLASSIFIED//FOR PUBLIC RELEASE

144.  On or about September 4, 2001, Mohamed Atta (AA #11) sent a Federal Express package containing Fayez Banihammad's (UA #175) ATM card and a blank check to **Mustafa al Hawsawi's** P.O. Box 19738 in Sharjah, United Arab Emirates. **Mustafa al Hawsawi** collected the package on or about September 8, 2001.

145.  On or about September 5, 2001, Fayez Banihammad (UA #175) wired approximately $8,000 from his Florida SunTrust account to his Standard Chartered Bank account, over which **Mustafa al Hawsawi** had power of attorney.

146.  On or about September 8, 2001, Mohamed Atta (AA #11) wired $2,860 to "Mustafa Ahmed" in the United Arab Emirates. **Mustafa al Hawsawi** retrieved the funds, using a true name photo identification, at the Wall Street Exchange, Dubai, United Arab Emirates, on or about September 9, 2001.

147.  On or about September 8, 2001, Mohamed Atta (AA #11) wired an additional $5,000 to "Mustafa Ahmed" in United Arab Emirates. **Mustafa al Hawsawi** retrieved the funds, using a true name photo identification, at the Wall Street Exchange, Dubai, United Arab Emirates, on or about September 10, 2001.

148.  On or about September 9, 2001, Waleed al Shehri (AA #11) wired $5,000 to "Ahanad Mustafa" in the United Arab Emirates. **Mustafa al Hawsawi** retrieved the funds, using a true name photo identification, at the Al-Ansari Exchange, Sharjah, United Arab Emirates, on or about September 11, 2001.

149.  On or about September 10, 2001, Marwan al Shehhi (UA #175) wired $5,400 to "Mustafa Ahmad" in United Arab Emirates. **Mustafa al Hawsawi** retrieved the funds, using a true name photo identification, at the Al-Ansari Exchange, Sharjah, United Arab Emirates, on or about September 11, 2001.

150.  On or about September 10, 2001, Nawaf al Hazmi (AA #77), using the alias "Rawf Al-Dog," attempted to send a package to **Mustafa al Hawsawi's** P.O. Box 19738, Al Sharjah, United Arab Emirates, containing a First Union VISA check card in the name of Khalid al Mihdhar (AA #77) and other account information.

151.  On or about September 10, 2001, **Ali Abdul Aziz Ali** flew from Dubai, United Arab Emirates, to Karachi, Pakistan.

152.  On or about September 11, 2001, in United Arab Emirates, **Mustafa al Hawsawi** deposited approximately 60,000 Dirhams (U.S. $16,348) into his Standard Chartered Bank account.

153.  On September 11, 2001, prior to the hijackings taking place in the United States, in Dubai, United Arab Emirates, **Mustafa al Hawsawi** transferred approximately 24,000 Dirhams (U.S. $6,534) from Fayez Banihammad's (UA #175) Standard Chartered Bank account into his own account, using a check dated September 10, 2001, and signed by

UNCLASSIFIED//FOR PUBLIC RELEASE   JA 84

UNCLASSIFIED//FOR PUBLIC RELEASE

Fayez Banihammad (UA #175). **Mustafa al Hawsawi** then withdrew approximately 5000 Dirhams (U.S. $1,361), nearly all the remaining balance in Banihammad's (UA #175) account, by ATM cash withdrawal.

154. On or about September 11, 2001, in United Arab Emirates, **Mustafa al Hawsawi** prepaid approximately 150,000 Dirhams (U.S. $40,871) to a VISA card connected to his Standard Chartered Bank account.

155. On or about September 11, 2001, **Mustafa al Hawsawi** flew from Dubai, United Arab Emirates, to Karachi, Pakistan.

156. On or about September 11, 2001, Mohamed Atta (AA #11) possessed a handwritten set of final instructions for a martyrdom operation using knives on an airplane. Copies of these instructions were in the possession of at least one hijacker on United Airlines #93 and also placed in Nawaf al Hazmi's (AA #77) Toyota Corolla at Washington Dulles International Airport.

157. On September 11, 2001, Mohamed Atta (AA #11) and Abdul Aziz al Omari (AA #11) flew from Portland, Maine, to Boston, Massachusetts.

158. On or about September 11, 2001, Mohamed Atta (AA #11) possessed an operating manual for a Boeing 757/767 Simulator, pepper spray, a knife, and a German travel visa.

159. On September 11, 2001, Mohamed Atta, Abdul Aziz al Omari, Satam al Suqami, Waleed al Shehri, and Wail al Shehri hijacked American Airlines Flight 11, which had departed from Boston, Massachusetts, at approximately 7:59 a.m. They crashed Flight 11 into the North Tower of the World Trade Center in Manhattan at approximately 8:46 a.m., causing the collapse of the tower and the deaths of 87 passengers and crew members on-board, and thousands of persons in and around the World Trade Center. (See Charge Sheet Appendix A for the list of individuals killed on Flight 11 and at the site of the World Trade Center).

160. On September 11, 2001, Marwan al Shehhi, Hamza al Ghamdi, Fayez Banihammad, Mohand al Shehri, and Ahmed al Ghamdi, hijacked United Airlines Flight 175, which had departed from Boston, Massachusetts, at approximately 8:14 a.m. They crashed Flight 175 into the South Tower of the World Trade Center in Manhattan at approximately 9:03 a.m., causing the collapse of the tower and the deaths of 60 passengers and crew members on-board, and thousands of persons in and around the World Trade Center. (See Charge Sheet Appendix A for the list of individuals killed on Flight 175 and at the site of the World Trade Center).

161. On September 11, 2001, Hani Hanjour, Khalid al Mihdhar, Majed Moqed, Nawaf al Hazmi, and Salem al Hazmi hijacked American Airlines Flight 77, which had departed from Dulles, Virginia, at approximately 8:20 a.m. They crashed Flight 77 into the Pentagon in Arlington, Virginia, at approximately 9:37 a.m., causing the deaths of 59 passengers and

UNCLASSIFIED//FOR PUBLIC RELEASE   JA 85

crew members on-board and 125 persons in the Pentagon. (See Charge Sheet Appendix A for the list of individuals killed on Flight 77 and at the Pentagon).

162. On September 11, 2001, Ziad Jarrah, Saeed al Ghamdi, Ahmed al Nami, and Ahmed al Haznawi hijacked United Airlines Flight 93, which had departed from Newark, New Jersey, at approximately 8:42 a.m. After resistance by several passengers, Flight 93 crashed in Somerset County, Pennsylvania, at approximately 10:03 a.m., killing all 40 passengers and crew members on-board. (See Charge Sheet Appendix A for the list of individuals killed on Flight 93).

163. Between on or about September 11, 2001, and on or about September 21, 2001, **Khalid Sheikh Mohammed** and others in his Karachi, Pakistan, guesthouse recorded many news stories of the attacks for future use in propaganda films.

CBT
9 Apr 12

164. On or about September 13, 2001, **Khalid Sheikh Mohammed** used the supplemental VISA card connected to **Mustafa al Hawsawi's** Standard Chartered Bank VISA account to make six ATM withdrawals in Karachi, Pakistan.

CBT
9 Apr 12

165. In late September 2001, Usama bin Laden, **Ramzi Binalshibh, Mustafa al Hawsawi,** and other members of al Qaeda met near Kabul, Afghanistan, to discuss the September 11th attacks; this meeting was videotaped and later released by al Qaeda for propaganda purposes.

166. On or about October 7, 2001, in Afghanistan, Usama Bin Laden praised the September 11th attacks, and vowed that the United States would not "enjoy security" before "infidel armies leave" the Arabian Peninsula.

167. On or about late 2001, **Khalid Sheikh Mohammed** attended a meeting with Usama bin Laden when Usama bin Laden confirmed al Qaeda's involvement in the September 11th attacks in a videotaped message.

CBT
9 Apr 12

## CHARGE II: VIOLATION OF 10 U.S.C. §950t (2), ATTACKING CIVILIANS

**Specification**: In that **Khalid Sheikh Mohammed, Walid Muhammad Salih Mubarak Bin `Attash, Ramzi Binalshibh, Ali Abdul Aziz Ali, and Mustafa Ahmed Adam al Hawsawi**, persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on September 11, 2001, at or near the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), and Shanksville, Pennsylvania, while in the context of and associated with hostilities, intentionally engage in attacks on civilian populations, to wit: the civilian population of New York, New York, in and around the World Trade Center, the civilian population of the Pentagon, and the passengers and crew of four civilian aircraft, to wit: American Airlines Flight #11, United Airlines Flight #175, American Airlines Flight #77, and United Airlines Flight #93, by intentionally crashing said civilian aircraft into the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), and a field in Shanksville, Pennsylvania, intending the object to be,

CBT
9 Apr 12

and the object which was, a civilian population as such, and individual civilians not taking direct or active part in hostilities; knowing the factual circumstances that established their civilian status, resulting in the deaths of 2,921 civilians.  (See Charge Sheet Appendix A for a list of the names of civilians killed).

## CHARGE III: VIOLATION OF 10 U.S.C. §950t (3), ATTACKING CIVILIAN OBJECTS

**Specification**: In that **Khalid Sheikh Mohammed, Walid Muhammad Salih Mubarak Bin `Attash, Ramzi Binalshibh, Ali Abdul Aziz Ali, and Mustafa Ahmed Adam al Hawsawi**, persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on September 11, 2001, at or near the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), and Shanksville, Pennsylvania, while in the context of and associated with hostilities, intentionally engage in attacks on civilian property, to wit: the World Trade Center (New York, New York) and four civilian aircraft, to wit: American Airlines Flight #11, a Boeing 767 aircraft, tail number N334AA; United Airlines Flight #175, a Boeing 767 aircraft, tail number N612UA; American Airlines Flight #77, a Boeing 757 aircraft, tail number N644AA; and United Airlines Flight #93, a Boeing 757 aircraft, tail number N591UA; that is, property that was not a military objective, intending the object to be, and the object which was, civilian property; knowing that such property was not a military objective, by intentionally crashing the said four civilian aircraft, into the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), and a field at or near Shanksville, Pennsylvania.

~~CHARGE IV: VIOLATION OF 10 U.S.C. §950t (13), INTENTIONALLY CAUSING~~ SERIOUS BODILY INJURY

**Specification**: In that **Khalid Sheikh Mohammed, Walid Muhammad Salih Mubarak Bin `Attash, Ramzi Binalshibh, Ali Abdul Aziz Ali, and Mustafa Ahmed Adam al Hawsawi**, persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on September 11, 2001, at or near New York, New York and Arlington, Virginia, while in the context of and associated with hostilities, intentionally cause and inflict serious injury to the body and health of one or more persons, with unlawful force and violence, in violation of the law of war by intentionally crashing civilian aircraft, to wit: American Airlines Flight #11, United Airlines Flight #175, and American Airlines Flight #77, into the World Trade Center (New York, New York) and the Pentagon (Arlington, Virginia). (See Charge Sheet Appendix B for a list of some, but not all, of the ~~victims that suffered serious bodily injury in the attacks).~~

UNCLASSIFIED//FOR PUBLIC RELEASE



## CHARGE V: VIOLATION OF 10 U.S.C. §950t (15), MURDER IN VIOLATION OF THE LAW OF WAR

**Specification**: In that **Khalid Sheikh Mohammed, Walid Muhammad Salih Mubarak Bin `Attash, Ramzi Binalshibh, Ali Abdul Aziz Ali, and Mustafa Ahmed Adam al Hawsawi,** persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on September 11, 2001, at or near New York, New York, Arlington, Virginia, and Shanksville, Pennsylvania, while in the context of and associated with hostilities, intentionally and unlawfully kill 2,976 persons in violation of the law of war by intentionally crashing four civilian aircraft, to wit: American Airlines Flight #11, United Airlines Flight #175, American Airlines Flight #77, and United Airlines Flight #93 into the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), and a field at or near Shanksville, Pennsylvania. (See Charge Sheet Appendix A for a list of victims killed in the attacks).

## CHARGE VI: VIOLATION OF 10 U.S.C. §950t (16), DESTRUCTION OF PROPERTY IN VIOLATION OF THE LAW OF WAR

**Specification**: In that **Khalid Sheikh Mohammed, Walid Muhammad Salih Mubarak Bin `Attash, Ramzi Binalshibh, Ali Abdul Aziz Ali, and Mustafa Ahmed Adam al Hawsawi,** persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on September 11, 2001, at or near New York, New York, Arlington, Virginia, and Shanksville, Pennsylvania, while in the context of and associated with hostilities, intentionally destroy property belonging to another person, without that person's consent, to wit: four civilian aircraft (American Airlines Flight 11, a Boeing 767 aircraft, tail number N334AA; United Airlines Flight #175, a Boeing 767 aircraft, tail number N612UA; American Airlines Flight #77, a Boeing 757 aircraft, tail number N644AA; and United Airlines Flight #93, a Boeing 757 aircraft, tail number N591UA); ~~the Pentagon (Arlington, Virginia);~~ and the North and South Towers of the World Trade Center (New York, New York); in violation of the law of war, by intentionally crashing said four civilian aircraft into the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), and a field at or near Shanksville, Pennsylvania.

## CHARGE VII: VIOLATION OF 10 U.S.C. §950t (23), HIJACKING OR HAZARDING A VESSEL OR AIRCRAFT

**Specification**: In that **Khalid Sheikh Mohammed, Walid Muhammad Salih Mubarak Bin `Attash, Ramzi Binalshibh, Ali Abdul Aziz Ali, and Mustafa Ahmed Adam al Hawsawi,** persons subject to trial by military commission as alien unprivileged enemy belligerents, did, in the skies over the United States, on September 11, 2001, while in the context of and associated with hostilities, intentionally seize, exercise unauthorized control over, and endanger the safe navigation of aircraft that were not legitimate military objectives, to wit: American Airlines Flight #11, United Airlines Flight #175, American Airlines Flight #77, and United Airlines Flight #93, resulting in the deaths of 2,976 persons. (See Charge Sheet Appendix A for a list of victims killed in the attacks).



UNCLASSIFIED//FOR PUBLIC RELEASE    JA 88

UNCLASSIFIED//FOR PUBLIC RELEASE

VII ᵃ⁺ʷ 20120404

CᵇT
9 Apr 12

## CHARGE VIII: VIOLATION OF 10 U.S.C. §950t (24), TERRORISM

**Specification**:  In that **Khalid Sheikh Mohammed, Walid Muhammad Salih Mubarak Bin `Attash, Ramzi Binalshibh, Ali Abdul Aziz Ali, and Mustafa Ahmed Adam al Hawsawi**, persons subject to trial by military commission as alien unprivileged enemy belligerents, did, on September 11, 2001, at or near New York, New York, Arlington, Virginia, and Shanksville, Pennsylvania, while in the context of and associated with hostilities, intentionally kill and inflict great bodily harm on one or more protected persons and engage in an act that evinced a wanton disregard for human life, in a manner calculated to influence and affect the conduct of the United States Government and civilian population by intimidation and coercion, and to retaliate against United States Government conduct, by intentionally crashing four civilian aircraft, to wit: American Airlines Flight #11, United Airlines Flight #175, American Airlines Flight #77, and United Airlines Flight #93 into the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), and a field at or near Shanksville, Pennsylvania, resulting in the deaths of 2,976 persons.  (See Charge Sheet Appendix A for a list of victims killed in the attacks).

UNCLASSIFIED//FOR PUBLIC RELEASE   JA 89